**No. 24-4909**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

**CONSTRUCTION LABORERS PENSION TRUST
OF GREATER ST. LOUIS and PAUL HADDOCK,**

*Plaintiffs-Appellants*,

v.

**FUNKO, INC.; ANDREW PERLMUTTER; JENNIFER FALL JUNG,**

*Defendants-Appellees*.

On Appeal from the United States District Court for the
Western District of Washington, No. 2:23-cv-00824-JLR
(The Honorable James L. Robart, District Judge)

## ANSWERING BRIEF FOR APPELLEES FUNKO, INC.,
## ANDREW PERLMUTTER AND JENNIFER FALL JUNG

David I. Freeburg
Lianna Bash
DLA PIPER LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA 98104
(206) 839-4800

Graham Ambrose
LATHAM & WATKINS LLP
200 Clarendon Street
Boston, MA 02116
(617) 948-6000

December 20, 2024

Kevin M. McDonough
Thomas J. Giblin
Elizabeth A. Parvis
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

Christine C. Smith
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200

*Counsel for Defendants-Appellees Funko, Inc.,
Andrew Perlmutter and Jennifer Fall Jung*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant-Appellee Funko, Inc. states that it has no parent corporation and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT .......................................................i

TABLE OF AUTHORITIES ..............................................................................iv

INTRODUCTION ..............................................................................................1

STATEMENT OF JURISDICTION.....................................................................3

STATEMENT OF THE ISSUES..........................................................................3

STATUTORY AUTHORITIES ...........................................................................3

STATEMENT OF THE CASE..............................................................................4

  A. Factual Background....................................................................4

  B. Procedural Background ..............................................................8

SUMMARY OF ARGUMENT .........................................................................12

STANDARD OF REVIEW ...............................................................................15

ARGUMENT ...................................................................................................16

I. THE DISTRICT COURT CORRECTLY HELD THAT PLAINTIFFS FAILED TO PLEAD FALSITY ....................................................................16

  A. Plaintiffs Fail To Challenge The District Court's Dismissal Of Nearly Half Of The Challenged Statements.......................................16

  B. Plaintiffs Fail To Allege Falsity With Respect To The Inventory Statements ..................................................................................17

    1. "Pandemic-Related Supply Chain Disruptions" Statement......19

    2. "Healthy" or "Generally High Quality" Statements.................20

  C. Plaintiffs Fail To Allege Falsity With Respect To The Risk Disclosures ................................................................................31

    1. Inventory Risk Factors .................................................31

**Page**

2. Software Risk Disclosures .......................................................37

D. Plaintiffs Fail To Allege Falsity With Respect To Statements Regarding The Timing Of Funko's Infrastructure Projects And Related Costs .......................................................................39

II. THE DISTRICT COURT CORRECTLY HELD THAT PLAINTIFFS FAILED TO PLEAD A "STRONG INFERENCE" OF SCIENTER...........45

A. The Complaint Lacks A Coherent Theory Of A Motive To Defraud .............................................................................46

B. Plaintiffs Abandoned Their Confidential Witness Allegations On Appeal.................................................................................47

C. Plaintiffs' Other Scienter Theories Fail ...............................49

1. Core Operations Theory...............................................50

2. Prior Litigation.............................................................56

3. Leadership Changes .....................................................58

4. Holistic Analysis ..........................................................59

III. THE DISTRICT COURT CORRECTLY DISMISSED PLAINTIFFS' SECTION 20(A) CLAIM .................................................................60

CONCLUSION ............................................................................................61

STATEMENT OF RELATED CASES ........................................................62

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Amalgamated Bank v. Facebook, Inc. (In re Facebook, Inc. Securities Litigation),*
  87 F.4th 934 (9th Cir. 2023) ......................................................................34

*Bennett v. CMH Homes, Inc.,*
  661 F. App'x 329 (6th Cir. 2016) ...............................................................21

*Berson v. Applied Signal Technology, Inc.,*
  527 F.3d 982 (9th Cir. 2008) ................................................................54, 55

*Brown v. Madison Reed, Inc.,*
  No. 22-16415, 2023 WL 8613496 (9th Cir. Dec. 13, 2023) ......................22

*City of Dearborn Heights Act 345 Police & Fire Retirement System v. Align Technology, Inc.,*
  856 F.3d 605 (9th Cir. 2017) ......................................................................30

*Corley v. Rosewood Care Center, Inc.,*
  388 F.3d 990 (7th Cir. 2004) ......................................................................21

*In re Countrywide Financial Corp. Securities Litigation,*
  588 F. Supp. 2d 1132 (C.D. Cal. 2008) ......................................................21

*Dolphin & Bradbury, Inc. v. SEC,*
  512 F.3d 634 (D.C. Cir. 2008).....................................................................35

*Espy v. J2 Global, Inc.,*
  99 F.4th 527 (9th Cir. 2024) .......................................................................51

*Ferreira v. Funko Inc.,*
  No. 22-cv-02319, 2021 WL 8820650 (C.D. Cal. Oct. 22, 2021) ...............56

*Gammel v. Hewlett-Packard Co.,*
  905 F. Supp. 2d 1052 (C.D. Cal. 2012) ......................................................58

*Glazer Capital Management, L.P. v. Forescout Technologies, Inc.,*
  63 F.4th 747 (9th Cir. 2023) ..................................................................22, 23

**Page(s)**

*Gray v. LifeLock, Inc. (In re LifeLock, Inc. Securities Litigation)*,
   690 F. App'x 947 (9th Cir. 2017) ..........................................................49

*Hamilton v. Conners (In re Cutera Securities Litigation)*,
   610 F.3d 1103 (9th Cir. 2010) ...............................................................21

*Hoang v. ContextLogic, Inc.*,
   No. 21-cv-03930, 2023 WL 8879263 (N.D. Cal. Dec. 22, 2023) ......................35

*Independent Towers of Washington v. Washington*,
   350 F.3d 925 (9th Cir. 2003) .................................................................16

*Indiana Public Retirement System v. Pluralsight, Inc.*,
   45 F.4th 1236 (10th Cir. 2022) ........................................................35, 36

*Inter-Local Pension Fund GCC/IBT v. Deleage (In re Rigel
   Pharmaceuticals, Inc. Securities Litigation)*,
   697 F.3d 869 (9th Cir. 2012) .......................................................15, 40, 60

*In re International Rectifier Corp. Securities Litigation*,
   No. 07-cv-2544, 2008 WL 4555794 (C.D. Cal. May 23, 2008) ........................58

*In re Iso Ray, Inc. Securities Litigation*,
   189 F. Supp. 3d 1057 (E.D. Wash. 2016)...............................................56

*Jaeger v. Zillow Group, Inc.*,
   644 F. Supp. 3d 857 (W.D. Wash. 2022) ...............................................56

*Janas v. McCracken (In re Silicon Graphics Inc. Securities
   Litigation)*,
   183 F.3d 970 (9th Cir. 1999) .................................................................49

*Janus Capital Group, Inc. v. First Derivative Traders*,
   564 U.S. 135 (2011)..............................................................................52

*Lloyd v. CVB Financial Corp.*,
   811 F.3d 1200 (9th Cir. 2016) ...............................................................21

*Luna v. Marvell Technology Group Ltd.*,
   No. 15-cv-5447, 2016 WL 5930655 (N.D. Cal. Oct. 12, 2016)........................58

v

**Page(s)**

*Macomb County Employees' Retirement System v. Align Technology, Inc.*,
39 F.4th 1092 (9th Cir. 2022) ......................................................................20

*Metzler Investment GMBH v. Corinthian Colleges, Inc.*,
540 F.3d 1049 (9th Cir. 2008) ......................................................................28

*Nguyen v. Endologix, Inc.*,
962 F.3d 405 (9th Cir. 2020) .............................................................45, 47, 60

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. American West Holding Corp.*,
320 F.3d 920 (9th Cir. 2003) ........................................................................45

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
575 U.S. 175 (2015) ............................................................................24, 30, 41

*Oregon Public Employees Retirement Fund v. Apollo Group Inc.*,
774 F.3d 598 (9th Cir. 2014) ........................................................................52

*Police Retirement System of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014) ...............................................23, 24, 44, 51, 53

*Prodanova v. H.C. Wainwright & Co.*,
993 F.3d 1097 (9th Cir. 2021) .............................................10, 46, 59, 60

*Pugh v. Tribune Co.*,
521 F.3d 686 (7th Cir. 2008) ........................................................................57

*Reese v. Malone*,
747 F.3d 557 (9th Cir. 2014), *overruled on other grounds in City of Dearborn Heights Act 345 Police & Fire Retirement System v. Align Technology, Inc.*, 856 F.3d 605 (9th Cir. 2017)....................................50

*In re Refco, Inc. Securities Litigation*,
503 F. Supp. 2d 611 (S.D.N.Y. 2007) ..........................................................57

*Renfro v. Champion Petfoods USA, Inc.*,
25 F.4th 1293 (10th Cir. 2022) .....................................................................21

**Page(s)**

*Rhode Island v. Alphabet, Inc. (In re Alphabet, Inc. Securities Litigation),*
　　1 F.4th 687 (9th Cir. 2021) ...................................................21, 32, 35

*Saunders v. Commissioner (Estate of Saunders v. Commissioner),*
　　745 F.3d 953 (9th Cir. 2014)...................................................48

*Set Capital LLC v. Credit Suisse Group AG,*
　　996 F.3d 64 (2d Cir. 2021) .....................................................35

*Smith v. Marsh,*
　　194 F.3d 1045 (9th Cir. 1999) .................................................16

*South Ferry LP, #2 v. Killinger,*
　　542 F.3d 776 (9th Cir. 2008) .................................................10, 11, 53

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
　　551 U.S. 308 (2007).............................................................45, 59

*United States v. Flores-Payon,*
　　942 F.2d 556 (9th Cir. 1991) .................................................28

*Walleye Opportunities Master Fund Ltd. v. Silver Lake Group, L.L.C. (In re Silver Lake Group, LLC Securities Litigation),*
　　108 F.4th 1178 (9th Cir. 2024) ................................................15, 52

*Warshaw v. Xoma Corp.,*
　　74 F.3d 955 (9th Cir. 1996) ...................................................22, 23

*Waswick v. Torrid Holdings, Inc.,*
　　No. 22-cv-8375, 2023 WL 9197563 (C.D. Cal. Dec. 1, 2023) .........................22

*Webb v. SolarCity Corp.,*
　　884 F.3d 844 (9th Cir. 2018) .................................................53, 54, 55

*Weston Family Partnership LLLP v. Twitter, Inc.,*
　　29 F.4th 611 (9th Cir. 2022) ...................................................27

*Wochos v. Testla, Inc.,*
　　985 F.3d 1180 (9th Cir. 2021) ........................................ 20, 24, 29, 30, 34, 43

**Page(s)**

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) ......................................................26, 45, 46, 48, 59

## STATUTES AND REGULATIONS

15 U.S.C. § 78j(b) ......................................................................................................9

15 U.S.C. § 78t(a) ........................................................................................9, 15, 60

15 U.S.C. § 78u-4(b)(2) ..........................................................................13, 45, 52

15 U.S.C. § 78u-5(c)(1)(A) ......................................................................................32

15 U.S.C. § 78u-5(c)(1)(B)(i) ..................................................................................32

15 U.S.C. § 78u-5(i)(l)(D) ........................................................................................43

17 C.F.R. § 240.10b-5 ................................................................................................9

## INTRODUCTION

This is an opportunistic "stock drop" case in which Plaintiffs seek to cobble together a securities fraud claim by second-guessing management projections that, with the benefit of hindsight, turned out to be overly optimistic. At the core of the case are two ambitious infrastructure projects that Defendant Funko, Inc. ("Funko") undertook to support the company's operations and rapidly growing sales. Funko's executives—Defendant Andrew Perlmutter, then Chief Executive Officer ("CEO"), and Defendant Jennifer Fall Jung, then Chief Financial Officer ("CFO," and collectively, the "Executive Defendants")—disclosed both projects to the market, along with their best estimates for cost and timeline. Unfortunately, those projects ran into unexpected obstacles that slowed their implementation. But when it became clear that delay was inevitable and costs would be higher than anticipated, Perlmutter and Jung promptly and voluntarily disclosed those facts. Neither sold any Funko stock or otherwise sought to profit before those disclosures and the ensuing stock price decline.

The District Court correctly recognized that the story Plaintiffs told in their amended complaint ("Complaint") was not indicative of securities fraud and dismissed the Complaint for two independent reasons. First, Plaintiffs failed to allege falsity with respect to any of the statements they challenged. As the District Court explained, all of the statements were protected under the safe harbor for

forward-looking statements established by the Private Securities Litigation Reform Act ("PSLRA"), were nonactionable puffery and/or opinion statements, or were not false or misleading. On appeal, Plaintiffs have waived any challenge to nearly half of the statements—which, among other things, mandates affirmance of the dismissal of Perlmutter as a defendant—and their arguments with respect to the other half fail to show any error in the District Court's well-reasoned decision.

Second, Plaintiffs failed to allege scienter. As the District Court explained, Plaintiffs' Complaint "lacks a coherent theory of motive to defraud." ER-44. Plaintiffs did not allege that Defendants wanted to inflate Funko's stock price to profit from stock sales. Nor did Plaintiffs allege other facts suggesting that Defendants had a financial incentive to temporarily conceal obstacles regarding Funko's infrastructure projects, only to reveal them mere months later. Further, on appeal, Plaintiffs have effectively abandoned what had been their lead scienter argument in the District Court, which depended on confidential witness ("CW") allegations the Court correctly discounted. Thus left without any meaningful insider witnesses or a coherent motive, Plaintiffs instead seek to establish scienter on the basis of the core operations theory, the existence of an earlier, largely-dismissed and now-settled lawsuit, and management turnover. Those scattered brushstrokes are not nearly enough to paint a strong picture of scienter. Rather, as the District Court concluded, the far more compelling inference—indeed, the *only* compelling

2

inference—is that Defendants sincerely believed Funko would meet its goals and responsibly updated investors when it became clear those goals were out of reach.

For all those reasons, this Court should affirm the District Court's dismissal of Plaintiffs' Complaint with prejudice.

## STATEMENT OF JURISDICTION

Defendants agree with Plaintiffs' Statement of Jurisdiction.

## STATEMENT OF THE ISSUES

1. Whether the District Court correctly dismissed Plaintiffs' Complaint for failure to plead falsity because the challenged statements were protected by the PSLRA's safe harbor for forward-looking statements, were nonactionable puffery and/or opinion statements, or were not adequately alleged to be false or misleading.

2. Whether the District Court correctly dismissed Plaintiffs' Complaint for the independent reason that Plaintiffs failed to plead a strong inference of scienter, especially given Plaintiffs' lack of any coherent theory of motive for fraud.

3. Whether the District Court correctly dismissed Plaintiffs' Section 20(a) claim, which is derivative of their Section 10(b) claim, for failure to plead the latter.

## STATUTORY AUTHORITIES

Pertinent statutory provisions are included in the attached addendum.

3

## STATEMENT OF THE CASE

### A.    Factual Background

Defendant Funko is a designer and seller of pop culture collectibles, including its trademark Funko Pop! vinyl figures.  ER-9.  Defendant Perlmutter served as the company's CEO from January 2022 to December 2022.  ER-77 (¶ 30).  Defendant Jung served as its CFO during the same period.  ER-77 (¶ 31).

During the COVID-19 pandemic, Funko Pop! figures experienced a "massive surge in popularity."  ER-68 (¶ 3).  As a result, Funko enjoyed "exceptional" growth.  ER-12 (quoting ER-89 (¶ 61)).  To sustain its rapid expansion, Funko embarked on two major infrastructure projects.  *See* ER-10–12.

First, Funko launched an upgrade to its digital infrastructure.  In 2020, the company decided to modernize its central information system and database, known as enterprise resource planning ("ERP") software.  ER-10–11.  Due to Funko's growth, the company planned to transition to Oracle, which was more powerful than its prior system.  ER-84 (¶ 47).

Second, Funko launched an upgrade to its physical infrastructure.  In 2021, the company decided to relocate and consolidate its five Washington warehouses into a single modern distribution center in Buckeye, Arizona.  *See* ER-10–12.  The move was designed to allow Funko to more efficiently manage its inventory, while achieving long-term cost savings.  ER-87 (¶ 57).

4

Both projects were substantial undertakings. *See* ER-11–12. The digital upgrade required hiring multiple third-party contractors to "clean" (i.e., reformat) the company's existing data so that it could be transferred into Oracle, while the physical upgrade required training a new labor force and extensive construction to outfit the brand-new Buckeye warehouse. ER-11–12 (quoting ER-85 (¶ 50)); ER-84, 91 (¶¶ 48, 66).

Funko kept shareholders informed about both projects. On March 3, 2022, Funko held an earnings call to discuss its 2021 financial results and 2022 forecast. ER-12. During that call, Jung told investors that the digital upgrade would "'probably launch in the beginning [of] the [third quarter]'" of 2022, while the physical relocation would "'happen in the first half'" of 2022. ER-90 (¶ 63). Consistent with that projection, Funko opened the Buckeye distribution center in April 2022 and began shipping existing inventory to, and filling orders from, that facility. ER-12–13.

On May 5, 2022, Funko filed its quarterly SEC report for the first quarter of 2022 and held an earnings call to discuss the company's results and plans. ER-13. During that call, Jung disclosed that inventory levels were up 161% over the prior year, due in part to pandemic-related supply chain disruptions. *Id.*

On August 4, 2022, Funko announced its financial results for the second quarter of 2022. ER-14. Funko disclosed that expenses and inventory levels were

5

both higher than they had been in the same quarter of 2021, due to a combination of factors including pandemic-related disruptions, the relocation to Buckeye, and the ERP upgrade. ER-100–01 (¶¶ 87-88). On an earnings call that same day, Jung announced that Funko had "made the difficult decision to delay" implementation of the ERP upgrade until 2023. ER-14 (quoting ER-100 (¶ 88)). She explained that many factors informed the decision, including that "'[Funko] did not want to impair [its] momentum . . . by shifting to a platform that [it] felt wasn't yet fully ready to support [Funko's] business.'" ER-100 (¶ 88). As a result, Funko now expected costs from the ERP implementation to extend into 2023. ER-14; ER-118 (¶ 130). Jung made a similar disclosure with respect to the Buckeye project, noting that Funko "'expect[ed] personnel and related costs to remain elevated through at least the end of 2022 to support the final transitions of our U.S. distribution warehouses.'" ER-118 (¶ 130) (alteration in original) (emphasis omitted). Finally, Jung explained that "'[w]hile our inventory levels are up year-over-year, we believe that inventory is generally high quality and leave[s] us well positioned to meet our consumer demand and support our strong second half growth forecast.'" ER-101 (¶ 89) (alterations in original) (emphasis omitted).

On September 13, 2022, Funko held a "Press and Investor Day," to update investors on the company's long-term growth plan, one part of which included the infrastructure upgrades. ER-124 (¶ 139). In his prepared remarks, Perlmutter

6

explained that the company was continuing to invest in new technology to "'help us get where we're going faster and better.'" *Id.* During the question-and-answer session, Jung noted that the elevated expenses in the first half of the year were attributable to "'the investments that we've made in the ERP as well as in the distribution center.'" ER-124 (¶ 140) (emphasis omitted); *see* SER-78. She further predicted that Funko would need "'more distribution capabilities to continue [to] support [its] growth'" in the future as part of the company's five-year plan. ER-125 (¶ 141) (emphasis omitted); *see* SER-79.

On November 3, 2022, Funko announced its financial results for the third quarter of 2022. ER-138 (¶ 166). Net sales had risen to $366 million, but as Perlmutter and Jung had previewed in August, the results also reflected elevated costs due to the infrastructure investments. *Id.* On an earnings call, Defendants explained that these higher-than-expected costs would last through 2022 while the ERP overhaul continued. ER-105–06 (¶ 99). Perlmutter candidly disclosed that, because of the previously-disclosed delays in the ERP implementation process, Funko had been forced to rely on "'more manual processes than we expected'" at Buckeye, which "'caught us a little bit off guard.'" ER-106 (¶ 101). Jung explained again that inventory levels remained higher than the prior year but "'[w]e believe that our inventory is generally high quality,'" and "'we will continue to work through our inventory levels and expect to make sequential progress.'" ER-126 (¶ 144)

7

(citation and emphasis omitted).  The next day Funko's stock price dropped to $7.92 per share from the previous close of $19.50.  ER-107 (¶ 103).

On December 5, 2022, Funko issued a press release announcing that Perlmutter would step down as CEO and resume his prior role as President, while Jung would resign as CFO, subject to a two-month agreement "to provide transition and advisory services to the Company."  SER-89; *see* ER-16; ER-77–78, 107 (¶¶ 30-31, 104).  The press release explained that the moves were designed "'to strengthen the Company's operations, drive enhanced returns for stockholders and best position Funko to capture the significant opportunities ahead.'"  ER-107 (¶ 104).

On March 1, 2023, Funko announced that while net sales for fiscal year 2022 had increased 29% from fiscal year 2021 to a total of $1.3 billion, "operational issues [had] impacted [Funko's] results in the second half of 2022," SER-92, and the company would write down "$30 to $36 million" of inventory "'to align [inventory] with the operating capacity of [Funko's] distribution center,'" ER-108 (¶ 106) (emphasis omitted).  Funko also announced it would not continue with the ERP overhaul and instead would take a $32.5 million write-down.  ER-108–09 (¶¶ 106, 108).  Funko's stock price fell from $10.70 to $9.94.  ER-109 (¶ 110).

## B.    Procedural Background

On June 2, 2023, Plaintiff Jonathan Studen filed the original putative class action complaint.  ER-16.  On August 1, 2023, Studen, the Construction Laborers

8

Pension Trust of Greater St. Louis ("Pension Trust"), and Paul Haddock filed motions seeking appointment as lead plaintiff. ER-16–17. On August 17, 2023, the District Court appointed the Pension Trust as lead plaintiff. ER-17.

The Pension Trust filed an amended complaint on October 19, 2023 on behalf of itself and Haddock, alleging violations of Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5. ER-63–150. The Complaint claimed that Defendants made 28 false or misleading statements between March 3, 2022 and March 1, 2023 (the "Class Period") and that these statements artificially inflated Funko's stock. ER-8, 17. The challenged statements at issue before the District Court fell into four basic categories: (1) risk disclosures related to inventory and software; (2) financial predictions and goals; (3) statements regarding Funko's inventory; and (4) statements regarding the anticipated timing of Funko's infrastructure projects. *See* SER-37–63.

On May 16, 2024, the District Court dismissed the Complaint, holding that it failed to plead a material misrepresentation or omission and scienter under Section 10(b). ER-21–22.

The District Court first held that Plaintiffs "fail[ed] to plausibly allege falsity" as to the challenged statements. ER-43. The Court concluded that each statement was either (1) protected by the PSLRA's safe harbor for forward-looking statements,

9

(2) nonactionable opinion and/or puffery, or (3) not false or misleading. Specifically, the Court held that the six risk-disclosure statements were protected by the safe harbor for forward-looking statements, as were the ten statements regarding Funko's financial projections and future plans. ER-25–38. The Court held that eight statements regarding Funko's inventory and the timing of its infrastructure projects constituted opinion and/or puffery, and the remaining four statements were not false or misleading. ER-38–43.

The District Court next held that even if Plaintiffs had plausibly alleged falsity, dismissal would still be warranted because Plaintiffs had failed to plead a strong inference of scienter. ER-43. The Court noted that Plaintiffs had not presented a "coherent theory of motive to defraud." ER-44. In particular, Plaintiffs had not pointed to any suspicious stock sales or other evidence of financial motive. And although Plaintiffs had advanced four theories of scienter, none was sufficiently "compelling and particularized" to satisfy the PSLRA. ER-44–52 (quoting *Prodanova v. H.C. Wainwright & Co.*, 993 F.3d 1097, 1108 (9th Cir. 2021)).

*First*, the District Court held that Plaintiffs did not satisfy the core operations doctrine because Plaintiffs had failed to plead "detailed and specific" allegations showing the Executive Defendants were exposed to factual information that rendered their statements false or misleading. ER-45–46 (quoting *S. Ferry LP, #2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008)). Nor could Plaintiffs show this was

10

"the 'exceedingly rare' and 'unusual' case where the court can impute knowledge to the Executive Defendants solely through their executive roles." ER-47–48 (quoting *S. Ferry*, 542 F.3d at 785 & n.3). *Second*, the Court held that Plaintiffs' CW allegations did not establish scienter because they were "vague" and failed to provide specific details about the witnesses' knowledge or reliability. ER-48–51. *Third*, the Court rejected Plaintiffs' attempt to infer scienter based on a prior lawsuit against Funko, explaining that "separate litigation involving a different time period and different, now-settled claims" does not show scienter. ER-52. *Finally*, the Court rejected Plaintiffs' arguments based on Sarbanes-Oxley certifications, Perlmutter's demotion, and Jung's alleged "termination," noting that "'[m]ost major stock losses are often accompanied by management departures, and it would be unwise for courts to penalize directors for these decisions.'" ER-52–53 (citation omitted).

Ultimately, the District Court concluded that a non-fraudulent inference was far more compelling than the malicious one advanced by Plaintiffs. ER-53–54. As the Court explained, "it is more plausible to infer that . . . the Executive Defendants lacked specific details about the infrastructural problems unfolding on the ground," and as soon as it "became clear that the Oracle Project would not launch on time" and "rising operational costs" would follow, Defendants "promptly disclosed" as much. ER-53; *see id.* (concluding it was more believable that Defendants "sincerely

11

believed that Funko's inventory was healthy overall and that Funko would meet its financial projections").

Finally, because Plaintiffs failed to plead an underlying violation of the Exchange Act, the Court dismissed their Section 20(a) claims. ER-54.

The Court granted Plaintiffs leave to amend so Plaintiffs could attempt to cure these deficiencies. ER-3; ER-167. But Plaintiffs ultimately declined the Court's invitation to amend, instead requesting that the Court enter final judgment. ER-3; ER-168. It did so on July 8, 2024. ER-3–6. Plaintiffs timely appealed. ER-154–57.

## SUMMARY OF ARGUMENT

**I.** The District Court properly dismissed the Complaint for failure to plead falsity. On appeal, Plaintiffs do not challenge that holding with respect to 11 of the 28 statements at issue, and so have waived any argument that the District Court improperly dismissed their claims as to those 11 statements. The remaining 17 statements fall into three categories—(1) statements regarding Funko's inventory; (2) risk disclosures; and (3) statements regarding the anticipated timing of Funko's infrastructure projects and related costs—all of which the District Court correctly dismissed.

First, the District Court correctly dismissed Plaintiffs' claims related to the inventory statements because Plaintiffs failed to plead the statements were false or

12

misleading, or because they are nonactionable puffery and/or opinion statements. On appeal, Plaintiffs seek to rewrite Jung's statements to say things she did not say, and to argue Jung had knowledge not pled in the Complaint. Those efforts fail.

Second, the District Court properly dismissed Plaintiffs' claims related to the risk disclosures because those disclosures are protected by the PLSRA's safe harbor. Plaintiffs contend that the safe harbor does not apply because the risks warned of in the disclosures had already materialized. But as the District Court correctly held, even if those risks had materialized, Plaintiffs failed to allege any facts showing that Defendants *knew* as much when they made the statements.

Third, the District Court properly dismissed Plaintiffs' claims related to the statements about Funko's infrastructure projects because Plaintiffs failed to plead the statements were false or misleading, the statements are nonactionable opinion and/or puffery, and/or they are protected by the safe harbor. Plaintiffs' arguments on appeal turn largely on unsuccessful efforts to rewrite what Defendants said.

**II.** The District Court also properly dismissed the Complaint for the independent reason that Plaintiffs failed to plead a "strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2). As the Court explained, "the amended complaint lacks a coherent theory of motive to defraud." ER-44. Plaintiffs have alleged no suspicious stock sales or other facts suggesting a financial motive. Instead, Plaintiffs' theory is that the Executive Defendants repeatedly promised growth through infrastructure

13

improvements they knew they could not accomplish with inventory they knew they could not sell—only to voluntarily reveal the alleged truth a few months later, for no apparent gain, at the cost of their jobs. That makes no sense. As the District Court explained, the far more compelling inference is that Defendants "sincerely believed" that Funko would meet its goals and that its inventory was healthy, and only "in hindsight[] [did] those projections prove[] far too optimistic." ER-53.

In the District Court, the Plaintiffs relied heavily on CW allegations in an attempt to plead scienter. But on appeal, Plaintiffs have effectively abandoned their CW allegations. With good reason. Plaintiffs failed to plead those allegations with the particularity required to establish their CWs' reliability and personal knowledge; further, most of the CWs offered only "vague allegations of internal disagreement." ER-50. That is not enough.

Lacking the usual indicia of scienter (suspicious stock sales and meaningful CW allegations), Plaintiffs instead rely on a smattering of other allegations, including the core operations theory, the existence of an earlier, largely-dismissed and since-settled lawsuit, and the management turnover that followed the stock-price decline. But none of those thin reeds suffice to establish a strong inference of scienter, either alone or together. At bottom, Plaintiffs' case rests on the speculation that Defendants must have known their projections were overly optimistic and a portion of their inventory would eventually need to be written down. But Plaintiffs

14

have alleged no facts suggesting that Defendants knew their statements were false (they were not) or acted with deliberate recklessness in making those statements. Instead, the far more compelling inference is that Defendants sincerely believed Funko would meet its goals, were just as disappointed as investors when it did not, and promptly disclosed this unfortunate news and lost their jobs as a result. That is not securities fraud.

**III.** Finally, the District Court properly dismissed Plaintiffs' Section 20(a) claim for failure to establish a predicate violation of the Exchange Act. *See* 15 U.S.C. § 78t(a); *Inter-Local Pension Fund GCC/IBT v. Deleage (In re Rigel Pharms., Inc. Sec. Litig.)*, 697 F.3d 869, 886 (9th Cir. 2012).

## STANDARD OF REVIEW

This Court reviews de novo the dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6). *Walleye Opportunities Master Fund Ltd. v. Silver Lake Grp., L.L.C. (In re Silver Lake Grp., LLC Sec. Litig.)*, 108 F.4th 1178, 1188 (9th Cir. 2024). A complaint alleging securities fraud must meet the "exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the . . . PSLRA," including stating "with particularity the circumstances constituting fraud" and the "facts giving rise to a strong inference" of scienter. *Id.* at 1191 (alteration in original) (citations omitted).

15

**ARGUMENT**

### I. THE DISTRICT COURT CORRECTLY HELD THAT PLAINTIFFS FAILED TO PLEAD FALSITY

#### A. Plaintiffs Fail To Challenge The District Court's Dismissal Of Nearly Half Of The Challenged Statements

Plaintiffs originally challenged 28 statements, but on appeal they do not contest the District Court's dismissal of 11 of them for failure to plead falsity. Accordingly, Plaintiffs have waived any challenge to the dismissal of claims related to those statements. *See, e.g.*, *Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) ("[W]e will not consider any claims that were not actually argued in appellant's opening brief."); *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999).

Critically, Plaintiffs make no mention of the only Perlmutter statements they challenged in the Complaint. *See* ER-111, 118, 124 (¶¶ 116, 131, 139). Plaintiffs have thus waived any challenge to the dismissal of their claims related to those three statements, and have correspondingly waived any challenge to the dismissal of Perlmutter as a defendant. Plaintiffs also make no mention of eight statements regarding Defendants' financial projections in the falsity section of their brief. *See* ER-111–15 (¶¶ 115, 117-18, 120-21, 124-26). Those statements are referenced, if at all, only in the background and/or the scienter sections. *See* Br. 8-9, 11, 54-55.

16

Because Plaintiffs do not challenge the District Court's holding that they failed to plead falsity for those statements, they have waived any challenge.[1]

As a result, there are only 17 challenged statements remaining on appeal. Those statements fall into three categories: (1) five statements regarding inventory; (2) six risk disclosures; and (3) six statements regarding the timing of Funko's infrastructure projects and related costs. As explained below, the District Court correctly dismissed the claims related to each category of statements.

**B.      Plaintiffs Fail To Allege Falsity With Respect To The Inventory Statements**

Plaintiffs challenge five statements Defendants made on August 4, 2022, and November 3, 2022 related to inventory. ER-119–20, -126 (¶¶ 132, 134-35, 144-45). The District Court correctly dismissed the claims related to all five statements.

Four of the challenged statements reflected Jung's belief that Funko's inventory overall was "generally high quality" and "healthy." Specifically, on August 4, 2022, Jung stated: "While our inventory levels are up year-over-year, we believe that inventory is generally high quality and leave us well positioned to meet our consumer demand and support our strong second half growth forecast." SER-

_____

[1]   The District Court dismissed Plaintiffs' claims related to these statements as protected by the safe harbor because they were expressly identified as forward-looking and accompanied by meaningful cautionary language. ER-35–38. Plaintiffs do not and cannot dispute the former, and to the extent Plaintiffs argue elsewhere that the cautionary language was not meaningful, that argument fails. *See infra* at 42.

72; *see* ER-119 (¶ 134). During that same call, Jung was asked "'where [Funko's] inventory resides, how much of it is related to the [distribution center] relocation,'" and "'[h]ow much might be in transit.'" SER-73. Jung acknowledged the shipping delays the industry had experienced but opined "'we feel the inventory is in a really good healthy position, and we're poised to deliver on our back half results.'" *Id.*; *see* ER-120 (¶ 135). As the District Court explained, Jung then went on to "candidly disclose[] ongoing, significant congestion" at the Buckeye facility. ER-42. Jung stated that "'[i]t was really about just managing through the congestion that we saw so far. . . . So there is a large portion of the [inventory] in-transit, but we're working to get that into the [distribution center] and get that out to our customers.'" SER-73.

Jung made similar statements on November 3, 2022. In the context of an earnings call in which Perlmutter and Jung candidly disclosed that Funko was facing "higher-than-expected short-term operating expenses" as a result of its infrastructure upgrades and that the Buckeye distribution center was not operating efficiently without Oracle, SER-84; *see* ER-74, 105 (¶¶ 17, 99), Jung stated: "We believe that our inventory is generally high quality[;] we will continue to work through our inventory levels and expect to make sequential progress," SER-85; *see* ER-126 (¶ 144). On that same day, Jung further stated in response to a question about "inventory levels" and "destocking": "As we think about our inventory, yes, it is up year-over-year. . . . That being said, we are constantly looking at the quality of our

18

inventory, and we think it generally is very healthy right now." SER-86; *see* ER-126 (¶ 145).

Plaintiffs also challenge a fifth statement made in an August 4, 2022 Form 8-K signed by Jung, attributing Funko's high inventory levels in part to COVID-19 shipping delays. Specifically, the statement acknowledged that Funko's inventory levels at the end of the second quarter of 2022 were higher than a year before, "reflecting receipt of delayed inventory as pandemic-related supply chain disruptions began to improve toward the end of the quarter." SER-66; *see* ER-119 (¶ 132).

The District Court correctly dismissed Plaintiffs' claims related to all five statements. The court held that the first four statements were nonactionable opinion and/or puffery, and the fifth statement was not false or misleading. ER-38–43.

### 1. *"Pandemic-Related Supply Chain Disruptions" Statement*

Plaintiffs argue that the explanation about the effect of shipping delays was false or misleading because it "'attribut[ed] the increase in Funko's inventory *solely* to "receipt of delayed inventory"'" during the COVID-19 pandemic. ER-43 (citation omitted); *see* Br. 26. But as the District Court explained, Defendants "never said 'that delayed inventory was the only factor contributing to the increase,' and the amended complaint shows that 'the receipt of delayed inventory *did* contribute to the increases.'" ER-43 (citations omitted); *see* ER-120–21 (¶ 138(a)).

19

Plaintiffs' argument turns on an effort to insert words like "only" or "solely" into the sentence. But as this Court has explained, plaintiffs cannot "rewrite[]" a defendant's statements. *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1193 (9th Cir. 2021). Because Plaintiffs have failed to plead facts showing the words "have some special or nuanced meaning that differs from what the literal words suggest," *id.*, the District Court correctly dismissed their claims related to this statement.

### 2. *"Healthy" or "Generally High Quality" Statements*

Turning to the other four statements regarding inventory health and quality, the District Court correctly concluded that these are nonactionable puffery and/or opinion statements. ER-38–42. Plaintiffs' contrary arguments are unavailing.

a. <u>Puffery</u>: These statements are nonactionable puffery because they do not provide a concrete description of the past or present that is objectively verifiable. "Corporate 'puffing' involves 'expressing an opinion' that is not 'capable of objective verification.'" *Macomb Cnty. Emps.' Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092, 1098-99 (9th Cir. 2022) (citation omitted). As this Court has explained, "'vague statements of optimism like "good," "well-regarded," or other feel good monikers[] are not actionable because professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives.'" *Id.* at 1099 (citation omitted). Such statements are actionable "only if they provide 'concrete description of the past and present' that affirmatively create a plausibly

20

misleading impression of a 'state of affairs that differed in a material way from the one that actually existed.'" *Rhode Island v. Alphabet, Inc. (In re Alphabet, Inc. Sec. Litig.)*, 1 F.4th 687, 700 (9th Cir. 2021) (citation omitted).

Jung's statements that Funko's inventory was "generally high quality" and "healthy," ER-119–20, 126 (¶¶ 134-35, 144-45), are just the sort of "mildly optimistic, subjective" descriptors that do not qualify as actionable statements, *Hamilton v. Conners (In re Cutera Sec. Litig.)*, 610 F.3d 1103, 1111 (9th Cir. 2010). Numerous courts have recognized that "descriptions such as 'high quality' are generally not actionable; they are vague and subjective puffery." *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1144 (C.D. Cal. 2008); *see Renfro v. Champion Petfoods USA, Inc.*, 25 F.4th 1293, 1307 (10th Cir. 2022) (statement that a vendor made "premium" and "high quality" products constituted puffery); *Bennett v. CMH Homes, Inc.*, 661 F. App'x 329, 332, 336 (6th Cir. 2016) (statement that a vendor's product was "higher quality" than an alternative constituted puffery). After all, "[t]he phrase 'high quality' is highly subjective," such that "no reasonable person could rely" on such a description when deciding whether to purchase a product or invest in a security. *Corley v. Rosewood Care Ctr., Inc.*, 388 F.3d 990, 1008-09 (7th Cir. 2004). In line with this authority, the Ninth Circuit has held that statements like "[t]he overall credit quality of the loan portfolio is sound," *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1206-07 (9th Cir. 2016) (alteration in original), and a hair dye kit is

21

"'Salon Quality,'" are "nonactionable puffery," *Brown v. Madison Reed, Inc.*, No. 22-16415, 2023 WL 8613496, at \*2 (9th Cir. Dec. 13, 2023).

The same is true with respect to Jung's statements, which do not offer any concrete description of the past or present; instead, they reflect only non-verifiable statements of optimism about the overall desirability of Funko's products. *See, e.g.*, *Waswick v. Torrid Holdings, Inc.*, No. 22-cv-8375, 2023 WL 9197563, at \*4-5 (C.D. Cal. Dec. 1, 2023) (statement that a company engaged in "effective in-season inventory management" was nonactionable puffery, despite allegations that the company had experienced shipment delays, causing a growing backlog of customer orders).

On appeal, Plaintiffs contend that even if Jung's statements would constitute puffery in some circumstances, they do not here because Jung made them in "response to specific questions from analysts about Funko's rising inventory." Br. 38. But even the premise is only half-true: just two of the statements were made in response to analyst questions. SER-73; SER-86. The other two were made as part of Jung's overall discussion of Funko's finances and goals. SER-72; SER-85. Regardless, the fact that two followed analyst questions does not render them misleading.

In support of their argument, Plaintiffs analogize to *Warshaw v. Xoma Corp.*, 74 F.3d 955 (9th Cir. 1996), and *Glazer Capital Management, L.P. v. Forescout*

*Technologies, Inc.*, 63 F.4th 747 (9th Cir. 2023). Br. 37-38. But neither case stands for the broad proposition that just because a statement is made in response to an analyst question, it can no longer be puffery. And both of those cases are far afield. In *Warshaw*, this Court held that a defendant's statement that "'everything [was] going fine'"—made "in response to market fears about FDA approval"—was actionable because the company "knew, based on its clinical studies," that its drug "would never be approved by the FDA." 74 F.3d at 959 (alteration in original) (citation omitted). Similarly, in *Glazer*, this Court held that statements that a company's pipeline of deals was "'very large'" and its rate of closing deals was "'very healthy'" were actionable because the company knew that many of the projected deals would never close. 63 F.4th at 759, 767-71.

Unlike in those cases, Plaintiffs have not alleged that Jung knew at the time of her statements that a material amount of inventory would need to be written down months later. *See infra* at 25-29. And, critically, "the context in which the statements were made is key." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014). Here, the August 4 statements were made in conjunction with Jung's disclosure that Funko was still "'managing through the congestion,'" including with respect to the "'large portion'" of inventory that was "'in-transit'" and that Funko was "'working to get . . . into the DC'" and "'out to our customers.'" ER-120 (¶ 135) (emphasis omitted); *see* ER-41–42. In that context, a

23

reasonable investor would understand Jung's statements as expressing "mere corporate optimism" about the quality of Funko's inventory and its ability to meet its sales goals despite delays, not as promising that all or even most of Funko's inventory would be sold. *Intuitive Surgical*, 759 F.3d at 1060. Similarly, the November 3 statements were made on the same day that Defendants disclosed that the delay in implementing Oracle was forcing Funko to use "'more manual processes than we expected,'" which "'caught us a little bit off guard.'" ER-106 (¶ 101). Again, in that context, "any reasonable investor would have understood" Jung's statement as "mere corporate optimism" about its inventory distribution and quality in the face of unexpected challenges. *Intuitive Surgical*, 759 F.3d at 1060.

b. Opinion: The challenged statements are likewise nonactionable opinions because they reflected Jung's subjective beliefs about Funko's inventory. As this Court has explained, an opinion statement is actionable only in three narrow circumstances: (1) where the speaker did not "'actually hold[] the stated belief'"; (2) where the opinion contains an "'embedded statement[] of fact'" that the speaker knows is untrue; and (3) where a reasonable investor would "'understand an opinion statement to convey facts about . . . the speaker's basis for holding that view'" that the speaker knows are untrue. *Wochos*, 985 F.3d at 1189 (quoting *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 184-85, 188 (2015)) (emphasis omitted). Plaintiffs argue that the third circumstance applies

24

because statements about Funko's inventory being healthy or high quality "misleadingly conveyed that 'Funko's inventory consisted of *saleable* products,'" despite Jung knowing that much of Funko's inventory was "dead" (nonsaleable), or soon would be because of the delays in Funko's infrastructure projects.  ER-10, 40 (quoting Plaintiffs' briefing); *see* Br. 32-35.

But that argument fails for at least two reasons, as explained in further detail below.  First, as the District Court explained, Plaintiffs fail to allege that, when she made the challenged statements, Jung had actual knowledge of the allegedly dead inventory or the delays in Funko's infrastructure projects.  ER-40.  Second, even if Jung had known about the delays, they would not render her opinions about the quality of the inventory false or misleading.  When Jung learned that Funko was facing distribution issues that were slowing the delivery of its inventory, she disclosed it.

Starting with the first reason, the District Court correctly found that Plaintiffs fail to allege that Jung knew either about the allegedly dead inventory or the logistical issues at Buckeye before Defendants disclosed them.  As for the former, Plaintiffs do not plausibly allege that Jung knew Funko was storing dead inventory, or that any of the inventory that had been shipped to Buckeye was nonsaleable, when she made the challenged statements.

Plaintiffs insist that Jung must have known about the allegedly dead inventory because she (a) "exhibited detailed knowledge of the inventory situation," (b) headed the Finance Group, and (c) attended "regular meetings with various teams to discuss sales forecasts and available inventory." Br. 30. But all Plaintiffs cite in support of their claim that Jung "exhibited detailed knowledge of the inventory situation" is one of the challenged statements about Funko's inventory being healthy. *Id.* (citing ER-126 (¶ 145)). Plaintiffs can neither infer "detailed knowledge of the inventory situation" from such a high-level statement nor bootstrap knowledge from a statement they allege to be false. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1001 (9th Cir. 2009) ("[F]alsity alone cannot create a strong inference of scienter.").

As for the Finance Group, Plaintiffs allege that the group "had responsibility for accounting for Funko's inventory levels," but they do not allege that the group knew that a significant amount of the inventory was unlikely to be sold, much less that Jung did. ER-129 (¶ 148). And as Plaintiffs concede, Jung oversaw a large number of groups, including "finance, sales, accounting, and Demand Planning, Procurement and Forecasting"—a volume of responsibility that suggests that Jung, like all executives, made strategic decisions and monitored these groups at a high level but delegated the granular details to others. ER-77 (¶ 31).

As for Plaintiffs' allegations regarding Jung's "regular" sales meetings, the Complaint is remarkably devoid of any specifics with respect to those meetings. As the District Court explained, "'regular' could mean once per week, month, year, or anywhere in between." ER-30. This allegation thus fails to show that the "Executive Defendants received specific details about the precise quantity and value of inventory that was obsolete, or how long Funko had been holding obsolete inventory." *Id.* Plaintiffs readily admit that they failed to allege "when or how often the meetings were held, what information was provided, or what precisely was discussed," claiming they do not need to do so at the pleading stage. Br. 32. But the PSLRA and Rule 9(b) say otherwise: "allegations of 'fraud must be accompanied by the who, what, when, where, and how of the misconduct charged.'" *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 619 (9th Cir. 2022) (citation omitted).

Turning to Jung's knowledge of the logistical issues facing the Buckeye distribution center, Plaintiffs focus not on what Jung knew but on what *someone else* may have known: Joe Sansone, Funko's Chief Operating Officer. But Sansone did not make *any* of the challenged statements. And as the District Court explained, even assuming that Plaintiffs adequately pled Sansone's knowledge, "Plaintiffs fail[ed] to connect the dots" between *his* knowledge and *Jung's*, who actually made the challenged statements. ER-29. Plaintiffs offered no "particularized allegations

27

showing the Executive Defendants had regular conversations, debates, and meetings with Mr. Sansone that specifically concerned these excess inventory issues." *Id.*

Rather than amend to allege such conversations or make any other effort to connect the dots, Plaintiffs simply conjecture on appeal that "[u]ndoubtedly, Sansone reported back to Perlmutter, and most likely to Fall Jung, what he was seeing" at Buckeye. ER-131 (¶ 152); *see* Br. 30-31 (arguing that "Sansone must have alerted Jung" and "Jung was undoubtedly aware"). But such rank speculation is not enough to satisfy the PSLRA's particularity requirement. *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008) (declining to "speculate as to the basis for the allegations" (citation omitted)).[2]

Plaintiffs alternatively argue that Sansone's knowledge can be imputed to the corporation, Br. 31, but that argument is waived and fails in any event. Plaintiffs mentioned Sansone only twice in their briefing below and *never* argued that his knowledge could be imputed to the corporation. *See* SER-13–14, 31 (Dkt. 47 at 3-4, 21). "Issues not presented to the trial court cannot generally be raised for the first time on appeal." *United States v. Flores-Payon*, 942 F.2d 556, 558 (9th Cir. 1991). Regardless, Plaintiffs' late-breaking argument fails. For opinion statements, what

---

[2] Plaintiffs also claim that the infrastructure projects "had the attention of senior executives." Br. 30. But all Plaintiffs cite in support of that claim are allegations that *Sansone* ultimately "took over the project himself." ER-84 (¶¶ 47-48). Thus, even this allegation comes back to Sansone's, and not Jung's, knowledge.

28

matters is the "*speaker's*" knowledge and "basis for holding that view." *Wochos*, 985 F.3d at 1189 (emphasis added) (citation omitted).

*Second*, even if Plaintiffs had plausibly alleged that Jung was aware of the logistical issues facing the Buckeye distribution center, that would not render her opinion statements about the health and quality of Funko's inventory misleading. For one thing, Jung never said that Funko's inventory was *uniformly* "high quality"—*i.e.*, that Funko had no unsaleable inventory—only that it was "generally" high quality. And to the extent Plaintiffs' argument depends on the theory that delays at the Buckeye distribution made it difficult to sell inventory before it became obsolete, Plaintiffs elide an important distinction between Funko's capability to timely distribute its inventory to paying customers and the quality of the inventory itself (i.e., that it was something customers would want to purchase). The challenged statements go to the latter, not the former.

Moreover, as discussed above and as the District Court emphasized, Jung expressly acknowledged the distribution challenges on the August 4 call, including "'the congestion,'" the "'large portion'" of inventory that was "'in-transit,'" and that Funko was "'working to get that [inventory] into the [distribution center]" and "'out to our customers.'" ER-120 (¶ 135) (emphasis omitted); *see* ER-41–42. Jung's opinion that Funko's inventory was healthy and generally high quality must be evaluated in light of these contemporaneous disclosures, and in that context, is not

29

false or misleading. *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615-16 (9th Cir. 2017) (opinion statement must be "misleading to a reasonable person reading the statement fairly and in context" (quoting *Omnicare*, 575 U.S. at 194)). This is also true with respect to Jung's November 3 statements, which Plaintiffs concede were made in the context of Perlmutter's acknowledgment that the Buckeye distribution center had been "designed" to run on Oracle and "was not operating efficiently without it." ER-74 (¶ 17). Even with these candid disclosures, moreover, Plaintiffs allege no facts suggesting that Jung shared their "gloomy view," developed with 20/20 hindsight, that it was impossible or even unlikely that Funko would be able to get the products at Buckeye into the hands of its customers. *Wochos*, 985 F.3d at 1194. In that context, Jung's statements were not misleading.

Finally, to the extent Plaintiffs try to cast Jung's statement as a warranty that all (or most) of Funko's inventory would ultimately be sold, that is not what Jung said. And even if it were, it would be nonactionable. As the Supreme Court has explained, "[r]easonable investors do not understand" opinion statements "as guarantees." *Omnicare*, 575 U.S. at 188. No reasonable person would understand Jung's words to convey a guarantee that all of Funko's inventory would be sold. Regardless, any such prediction would be a classic forward-looking statement

30

protected by the safe harbor. *See* SER-69 (expressly identifying "forecasts" and "targets" as forward-looking statements); SER-82 (similar).

Therefore, for all of those reasons, the District Court correctly determined that the inventory statements were nonactionable.

## C. Plaintiffs Fail To Allege Falsity With Respect To The Risk Disclosures

Plaintiffs also challenge six risk disclosures Funko made in its public SEC filings: four related to inventory and two related to software. The District Court correctly concluded that all six are protected by the PSLRA's safe harbor.

### 1. *Inventory Risk Factors*

From March 3, 2022 to November 3, 2022, Funko listed the following risk disclosure in its quarterly SEC filings:

> Our success depends, in part, on our ability to successfully manage our inventories. . . . If demand or future sales do not reach forecasted levels, we could have excess inventory that we may need to hold for a long period of time, write down, sell at prices lower than expected or discard. . . . If we are not successful in managing our inventory, our business, financial condition and results of operations could be adversely affected.

SER-95; SER-98; SER-104; SER-109 (emphasis omitted); *see* ER-110–11, 114, 117, 126 (¶¶ 114, 123, 128, 143). Funko's filings further disclosed that this risk had previously materialized in 2019. Specifically, "in the fourth quarter of 2019, [Funko] wrote-down $16.8 million of inventory due to [Funko's] decision to dispose of

31

slower moving inventory to increase operational capacity which contributed to the Company's net loss for the period." SER-95; *see* SER-99; SER-105; SER-109.

The District Court concluded that these disclosures are forward-looking and therefore protected by the PSLRA's safe harbor. The safe harbor applies in two circumstances. First, the safe harbor applies when the challenged statement is expressly "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A). Second, it applies when the "plaintiff fails to prove that the forward-looking statement" was "made with actual knowledge by [the speaker] that the statement was false or misleading." *Id.* § 78u-5(c)(1)(B)(i).

The District Court found that the risk disclosures fell within the second circumstance in which the safe harbor applies. As the Court explained, "plaintiffs challenging risk disclosures can successfully plead falsity only where their allegations show the defendants '*knew* that th[e] [warned of] risks had materialized.'" ER-27 (quoting *Alphabet*, 1 F.4th at 704). And here, Plaintiffs "fail to offer particularized allegations demonstrating the Executive Defendants knew at the time of the disclosures that the stated risks had materialized." ER-28.

Specifically, the District Court concluded that although Plaintiffs point to allegations suggesting that *Sansone* may have known of the inventory issues,

32

"Plaintiffs fail to connect the dots" between his knowledge and Jung's or Perlmutter's. ER-29; *see supra* at 27-28. And Plaintiffs have waived any argument that Sansone's knowledge should be imputed to Funko itself. *Supra* at 28-29. Further, Plaintiffs' allegations that the Executive Defendants attended "regular" sales meetings fell far short of alleging that the "Executive Defendants received specific details about the precise quantity and value of inventory that was obsolete, or how long Funko had been holding obsolete inventory." ER-30; *see supra* at 26-27. And while Plaintiffs alleged that Perlmutter had visited Buckeye, the Complaint does not "reveal the date or length of Mr. Perlmutter's visit, the purpose of the visit, whether he interacted with employees during that visit, or any other alleged facts that would tend to show Mr. Perlmutter witnessed and appreciated the extent of excess inventory issues." ER-30. Thus, the District Court correctly held that Plaintiffs failed to plead actual knowledge.

On appeal, Plaintiffs primarily contend that the District Court erred when it found that the statements were forward-looking and subject to the safe-harbor analysis—including the actual-knowledge requirement—because, according to Plaintiffs, the risks warned of in the disclosures had already materialized. Br. 41-43. In other words, Plaintiffs argue that the risk disclosures were false or misleading *because* the risks had materialized—regardless of whether Defendants *actually knew* that they had.

But the disclosures unquestionably look forward, using conditional language to describe potential outcomes (e.g., "If we are not successful in managing our inventory, our business . . . could be adversely affected"), and Plaintiffs have not identified a "concrete assertion concerning a specific current or past fact" that would bring the statements outside the protections of the safe harbor. *Wochos*, 985 F.3d at 1191 (internal quotations omitted). Thus, the safe harbor applies and Plaintiffs must prove that the Defendants had actual knowledge of the alleged materialization of the risk. Plaintiffs' argument to the contrary misreads this Court's decisions in *Amalgamated Bank v. Facebook, Inc. (In re Facebook, Inc. Securities Litigation)*, 87 F.4th 934 (9th Cir. 2023), and *Alphabet*, both of which require actual knowledge that the risks allegedly had materialized for a risk disclosure to be misleading.

Indeed, in the very first sentence of its analysis section, the *Facebook* Court described the "essence" of the plaintiffs' challenge as being that "although Facebook *knew* Cambridge Analytica had improperly accessed and used Facebook users' data, Facebook represented in its 2016 Form 10-K that only the hypothetical risk of improper third-party misuse of Facebook users' data could harm Facebook's business, reputation, and competitive position." 87 F.4th at 948 (emphasis added); *see also id.* at 949 (describing how "Facebook's statements about risk management 'directly contradict[ed]' what the company *knew*" (alteration in original) (emphasis added) (citation omitted)). The same is true with respect to *Alphabet*. As the Ninth

34

Circuit explained, "Alphabet's warning . . . of risks that 'could' or 'may' occur [was] misleading to a reasonable investor when Alphabet *knew* that those risks had materialized." *Alphabet*, 1 F.4th at 704 (emphasis added).

Other circuits, and other district courts in this Circuit, likewise apply the PSLRA's actual-knowledge requirement in these circumstances. *See, e.g.*, *Hoang v. ContextLogic, Inc.*, No. 21-cv-03930, 2023 WL 8879263, at *12 (N.D. Cal. Dec. 22, 2023) (interpreting *Facebook* and *Alphabet* to require allegations that "Defendants *knew*" the risks warned of were "already" occurring (emphasis altered)). For example, in *Set Capital LLC v. Credit Suisse Group AG*, the Second Circuit held that the safe harbor did not apply to Credit Suisse's warning that its hedging activity "'could'" impact the prices of certain notes when the complaint plausibly alleged that Credit Suisse "*knew* with virtual certainty" that its "hedging activity would significantly depress the value" of the notes. 996 F.3d 64, 85-86 (2d Cir. 2021) (emphasis added). As the Second Circuit explained, "there is a 'critical distinction between disclosing the risk a future event might occur and disclosing *actual knowledge* that the event will occur.'" *Id.* at 85 (emphasis altered) (quoting *Dolphin & Bradbury, Inc. v. SEC*, 512 F.3d 634, 640 (D.C. Cir. 2008)).

The Tenth Circuit applied similar reasoning in *Indiana Public Retirement System v. Pluralsight, Inc.*, 45 F.4th 1236 (10th Cir. 2022). There, the defendant had warned that if it was "unable to hire, develop, and retain talented sales or marketing

35

personnel," its business "could be harmed." *Id.* at 1254. Plaintiffs argued that this statement was misleading because the defendant "was already months and dozens of [sales] representatives behind" where it needed to be, "severely threatening billings growth." *Id.* at 1255 (citation omitted). The Tenth Circuit disagreed, explaining that "nothing in the complaint supports the inference that Defendants *knew* [they were] so far behind in [their] sales ramp capacity plan that it was virtually certain to cause harm." *Id.* at 1256-57 (emphasis added). The same is true here. Plaintiffs failed to plead that Defendants had actual knowledge that Funko allegedly had significant dead inventory that it was virtually certain to need to write down. The District Court therefore correctly dismissed Plaintiffs' claims based on these risk disclosures.

Ultimately, Funko disclosed to investors that it had high inventory levels as a result of congestion and distribution delays, warned that it could need to write down that inventory if it became obsolete, and did write down that inventory when it became clear that was required. *See supra* at 5-8, 17-19, 31-32. Plaintiffs have never contested the timing of that write-down, nor does the Complaint contain any well-pled facts suggesting Defendants knew the write-down needed to occur sooner. Plaintiffs have therefore not adequately alleged that Defendants knew the underlying risks had materialized, and the risk disclosures are protected by the safe harbor.

36

**2.** *Software Risk Disclosures*

Plaintiffs also challenge two software-related risk disclosures from Funko's May 5, 2022 and August 4, 2022 SEC filings. The May 5, 2022 disclosure stated: "Failure to successfully operate our information systems and implement new technology effectively could disrupt our business or reduce our sales or profitability. . . . If the potential upgrades are not successful or result in delays, our business could be disrupted or harmed." SER-100; *see* ER-113–14 (¶ 122). The August 4, 2022 disclosure included the italicized additions: "*In August 2022, we announced that we are delaying the remaining steps for implementation of our [ERP] software to 2023*. If the potential upgrades are not successful or result in *further* delays, our business could be disrupted or harmed." SER-106 (emphasis added); *see* ER-118 (¶ 129).

As the District Court explained, the August 4, 2022 statement was plainly not false or misleading because it "expressly advised" that a delay "had indeed come to pass." ER-32. On appeal, Plaintiffs contend that this statement was misleading because *other* statements made on the same day "minimiz[ed] the delayed upgrade's impact." Br. 46-47. For example, Plaintiffs point to Jung's statement that Funko "'did not want to impair the momentum that we have today by shifting to [an ERP] platform that we felt wasn't yet fully ready to support our business.'" ER-119 (¶ 133) (emphasis omitted). But even if *that* statement was actionably misleading (and it is

37

not, *see infra* at 40-41), that would do nothing to show that *the challenged risk disclosure*—which "candidly informed investors that Oracle would not timely launch" and warned that "'further'" delays were possible, ER-31–32 (citation omitted)—was false or misleading.

With respect to the May 5, 2022 statement, the District Court correctly concluded that Plaintiffs "fail to plausibly allege the Executive Defendants actually knew by May 5, 2022, that a delay of the Oracle launch was certain or substantially likely to occur." ER-32. On appeal, Plaintiffs do not meaningfully challenge this holding. Instead, they simply insist that the risk of delay had already materialized— without pointing to any allegations that Defendants *knew* it had materialized. Br. 31-32, 45-46. But as explained above, *Facebook* and *Alphabet* require actual knowledge—and Plaintiffs have shown none. *See supra* at 34-36. Moreover, the idea that Defendants were hiding that the Oracle launch would have to be delayed in May, only to disclose as much in August, is simply not plausible. The only reasonable inference is that Defendants disclosed the delay when they knew it would occur—in August, not May. Accordingly, the District Court properly dismissed Plaintiffs' claims related to the software disclosures.

38

**D.** **Plaintiffs Fail To Allege Falsity With Respect To Statements Regarding The Timing Of Funko's Infrastructure Projects And Related Costs**

Finally, Plaintiffs challenge six statements related to the timing of Funko's infrastructure projects and related costs. The District Court properly dismissed those statements as not false or misleading, protected by the safe harbor, or opinion and/or puffery.

*First*, Plaintiffs challenge the statement in Funko's August 4, 2022 Form 10-Q that Funko "expect[ed] personnel and related costs to remain elevated through at least the end of 2022 to support the final transitions of our U.S. distribution warehouses," and that Funko further "expect[ed] elevated costs related to our [ERP] implementation as we expect to finalize the remaining steps in early 2023." SER-103; *see* ER-118 (¶ 130). On appeal, Plaintiffs contend that this statement was false or misleading because the warehouse "consolidation was [not] in the 'final transition[]' stage." Br. 26 (alteration in original) (citation omitted). But the 10-Q did not state that the consolidation was *already in* its final transition stage; rather, consistent with Funko's same-day announcement that its ERP implementation was being delayed to 2023, it truthfully disclosed that costs associated with both the warehouse and ERP projects were expected to remain high through "at least" the end of 2022 and into 2023 *through* "the final transitions." SER-103. Plaintiffs are once

39

again attempting to rewrite Defendants' statements, but even a cursory glance at the 10-Q reveals that that document never said what Plaintiffs claim.

*Second*, Plaintiffs challenge Jung's statement in an earnings call the same day regarding the reasons for delaying implementation of the ERP project to 2023.  As Jung explained, "[t]here were a number of factors that contributed to [the] decision, but ultimately, we did not want to impair the momentum that we have today by shifting to a platform that we felt wasn't yet fully ready to support our business." SER-71-72; ER-119 (¶ 133).  As the District Court held, the statement that Funko had "momentum . . . today" is classic puffery.  ER-39 (citation omitted).  It does not provide a "concrete description of the past and present"; rather, it is a statement of optimism comparable to "business couldn't be better."  *Id.* (citations omitted).

On appeal, Plaintiffs suggest that this statement was false or misleading because the decision to delay implementation of the ERP project itself impaired momentum going forward.  Br. 16, 46-47.  But Plaintiffs do not contend that Funko could have improved momentum by switching to Oracle before it was ready, and even if it could have, Jung's expectation and belief that delaying implementation of Oracle would avoid impairing momentum is both a protected forward-looking statement and a nonactionable opinion statement.  *Cf. In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d at 882 (no falsity where plaintiffs pled "only that Defendants should

40

have had *different* expectations and beliefs," not that their expectations and beliefs were "*false*" (first emphasis added)).

*Third*, Plaintiffs challenge a similar statement that Jung made during the same call in response to a question about what the delayed Oracle implementation would mean for Funko's costs in 2022. *See* SER-74; ER-120 (¶ 136). Jung stated that costs associated with the project would not decrease in 2022 because Funko would "continue to work" on implementation but that Funko did not "see it as a major headwind in 2022 so far." SER-74; *see* ER-120 (¶ 136). The District Court concluded that this "headwind" statement was a nonactionable opinion. ER-39. On appeal, Plaintiffs contend the opinion turned out to be wrong, *see* Br. 46-47, but "an investor cannot state a claim by alleging only that an opinion was wrong," *Omnicare*, 575 U.S. at 194. Thus, Plaintiffs' argument supplies no basis for disturbing the holding that Plaintiffs failed to allege falsity as to Jung's headwind statement.

*Fourth*, Plaintiffs challenge another statement that Jung made during the same call in response to an investor question about "cash flow." SER-74; *see* ER-120 (¶ 137). Specifically, Jung disclosed that there had been "a couple high [uses] of cash," including "the distribution center, that was a major feat to get that up and running." SER-74. Plaintiffs allege that this statement was misleading because it implied the Buckeye facility was "fully operational." ER-101 (¶ 88). But that is not what Jung said. She did not claim the distribution center was "fully operational,"

41

*id.*; instead, she simply stated that it was "up and running," SER-74. And Plaintiffs admit that the distribution center *was* open and fulfilling orders at that time, just as Jung said. ER-91, 94 (¶¶ 66, 75). Therefore, the District Court correctly held the statement was not false or misleading. ER-42–43

*Fifth*, Plaintiffs challenge a statement Jung made on September 13, 2022 regarding Funko's need for additional "distribution capabilities" as part of its five-year plan. SER-79; *see* ER-125 (¶ 141). In response to an investor question about investments needed for growth, Jung stated: "Obviously, down the road, we'll eventually need probably more distribution capabilities to continue [to] support the growth, but that's more of a future down the road within the 5-year plan, but not directly related within the next, call it, 12 months or so." SER-79. The District Court correctly concluded that this statement was protected by the safe harbor because it was expressly identified as forward-looking and accompanied by meaningful cautionary language. ER-35–38; *see* ER-62.

On appeal, Plaintiffs contend that the cautionary language relating to Jung's statement was not meaningful because it warned of risks associated with Funko's failure to adequately "'manage [its] inventories,'" but that Funko failed to disclose that these risks had "already materialized." Br. 49 (quoting ER-62); *see* SER-104. But as explained above, Plaintiffs are wrong that Defendants knew of and failed to disclose any materialization of these risks. *See supra* at 25-29, 31-36.

42

Plaintiffs separately contend that the safe harbor does not apply because this is a "mixed statement" containing an implied representation that Funko's current distribution capabilities were adequate—a representation that Plaintiffs claim was false because Funko later rented additional warehouse space to store dead inventory. Br. 48-49. But that argument is wrong twice over.

First, as a legal matter, "assumptions incorporated into a projection" are forward-looking under the PSLRA. *Wochos*, 985 F.3d at 1192; *see* 15 U.S.C. § 78u-5(i)(l)(D). Statements that a defendant is "'on track' to achieve [a particular] goal and that 'there are no issues' that would prevent [the defendant] from achieving the goal" are "forward-looking statements," just like the goal itself. *Wochos*, 985 F.3d at 1192. That is because "any announced 'objective' for 'future operations' *necessarily* reflects an implicit assertion that the goal is achievable based on current circumstances." *Id.* If that implicit assertion defeated application of the safe harbor, the safe harbor "would cease to exist." *Id.* The same is true here. If the implicit assertion that current distribution capabilities were adequate rendered the safe harbor inapplicable to Jung's projection that more distribution capabilities would be needed at some point in the future, the safe harbor would cease to exist.

Second, the new warehouse space that Funko rented was for temporary "stor[age]," not distribution, let alone long-term distribution capabilities. Br. 48. Thus, at most, Funko's acquisition of temporary warehouse space shows only that

43

its current *storage* capabilities may not have been adequate, not that its current *distribution* capabilities required enhancement. Accordingly, even assuming the safe harbor did not apply, Plaintiffs have still failed to allege Jung's statement was false or misleading.

Finally, Plaintiffs challenge another statement Jung made during the same call in response to a question about increased operating expenses associated with Funko's infrastructure projects. *See* SER-77–78. Specifically, Jung stated: "What you saw for the first half of the year so far in this year is really the investments that we've made in the ERP as well as in the distribution center." SER-78; *see* ER-124 (¶ 140). Plaintiffs cast this statement as "provid[ing] (false) reassurance that the increase in investment was focused on the first half of the year." Br. 47. But this is yet another attempt to rewrite Jung's statement, which says nothing about increased expenses being limited to the first half of the year. Rather, it is a straightforward factual explanation for expenses that had already been incurred in that period. Indeed, Defendants had already disclosed a month earlier that they had made the "difficult decision to delay" implementation of the ERP project, and that they expected costs associated with that project, as well as the warehouse consolidation, to continue through the end of 2022. SER-71; SER-103. The statement must be read with those prior announcements as context. *Intuitive Surgical*, 759 F.3d at 1060.

44

Thus, as the District Court held, this statement was not false or misleading. ER-42–43.

* * *

For all those reasons, the District Court correctly dismissed the Complaint for failure to plead falsity. If this Court agrees, it need not reach the scienter arguments below, which provide an independent basis for dismissal.

## II. THE DISTRICT COURT CORRECTLY HELD THAT PLAINTIFFS FAILED TO PLEAD A "STRONG INFERENCE" OF SCIENTER

The District Court correctly dismissed the Complaint for the independent reason that Plaintiffs failed to plead a "strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). Scienter is "a mental state embracing intent to deceive, manipulate, or defraud," as well as "'deliberate recklessness.'" *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020) (quoting *Zucco*, 552 F.3d at 991). Deliberate recklessness far exceeds even "inexcusable negligence," and is defined as "an *extreme* departure from the standards of ordinary care" that "presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it." *Zucco*, 552 F.3d at 991 (emphasis added) (citation omitted). However, as discussed above, "if the challenged act is a forward-looking statement, the required state of mind is 'actual knowledge . . . that the statement was false or misleading.'" *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W.*

45

*Holding Corp.*, 320 F.3d 920, 931 (9th Cir. 2003) (alteration in original) (citation omitted). Courts may "only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference." *Zucco*, 552 F.3d at 991.

Here, the Complaint lacks a coherent theory of a motive to defraud and the usual indicia of scienter: suspiciously timed stock sales and reliable CW allegations. Instead, Plaintiffs attempt to infer scienter from a collection of scattershot allegations, including the existence of a prior lawsuit that was largely dismissed and turnover among Funko's executives. None—whether considered separately or together— come close to pleading a strong inference of scienter.

## A. The Complaint Lacks A Coherent Theory Of A Motive To Defraud

As the District Court explained, "the amended complaint lacks a coherent theory of motive to defraud." ER-44. "Generally, we expect that a financial motive for securities fraud will be clear; for example, someone inside a company stands to gain a substantial profit by engaging in deceptive behavior, such as selling shares before the company discloses negative information." *Prodanova*, 993 F.3d at 1107. But here, Plaintiffs have identified no stock sales at all by Jung (or Perlmutter), let alone suspicious sales or any other facts suggesting the Executive Defendants would have stood to gain financially by misleading investors for a period of mere months.

46

On the contrary, Plaintiffs' theory seems to be that Defendants over-promised infrastructure developments on a timeline they *knew* they could not meet and concealed the fact that inventory would need to be written down in the future—only to come clean a few months later, at no personal gain (and much to their detriment). As the Ninth Circuit explained in a similar case, "[that] theory does not make a whole lot of sense. It depends on the supposition that defendants would rather keep the stock price high for a time and then face the inevitable fallout once [the] problem was revealed." *Nguyen*, 962 F.3d at 415. Such a strategy might be logical "[i]f defendants had sought to profit from this scheme in the interim, such as by selling off their stock or selling the company at a premium." *Id.* But no such allegations exist here. As the District Court explained, the much more compelling inference is that Defendants genuinely believed that Funko would meet its goals and, "once it became clear that the Oracle Project would not launch on time," they "promptly disclosed the delay" and the associated "rising operational costs." ER-53.

## B. Plaintiffs Abandoned Their Confidential Witness Allegations On Appeal

In the District Court, Plaintiffs relied heavily on CW allegations in their failed attempt to establish scienter. *See, e.g.*, SER-28–29 (Dkt. 47 at 18-19) ("1. Former Employee Accounts Support Scienter"). The District Court rejected Plaintiffs' CW allegations as a basis for inferring scienter, finding that "Plaintiffs' most direct (and perhaps strongest) CW allegation" could not be credited because Plaintiffs had failed

47

to allege that CW was even employed by Funko during the Class Period. ER-49 (citing ER-86 (¶ 54)). The remaining CW allegations amounted to no more than "vague allegations of internal disagreement." ER-50.

On appeal, Plaintiffs do not meaningfully dispute these conclusions and virtually abandon their CWs. Plaintiffs relegate their principal discussion of the CWs to a footnote, *see* Br. 55 n.5, which is not sufficient to preserve an argument on appeal, *see Saunders v. Comm'r (Est. of Saunders v. Comm'r)*, 745 F.3d 953, 962 n.8 (9th Cir. 2014) ("Arguments raised only in footnotes, or only on reply, are generally deemed waived."). Plaintiffs have thus forfeited any argument that the District Court improperly discounted their CW allegations.

In any event, the District Court correctly held that the CW allegations do not establish scienter. Indeed, Plaintiffs fail to provide most (and in some cases all) of the basic information about their CWs that courts require before considering the allegations attributed to them, including a CW's job title, seniority, reporting lines, or time of employment. *See Zucco*, 552 F.3d at 995 (requiring (1) CWs "be described with sufficient particularity to establish their reliability and personal knowledge"; and (2) CW statements "themselves be indicative of scienter"). Worse, Plaintiffs often fail to identify which CW (if any) made the allegations Plaintiffs purport to recount in the Complaint. *See, e.g.*, ER-82, 112, 116 (¶¶ 44, 119, 127) (making general allegations that issues were "widely known" or "well-understood

48

inside Funko"). And, as the Court found, the allegations attributed to the few CWs for whom basic details were provided are not indicative of scienter. ER-50 ("In general, the CW accounts amount to vague allegations of internal disagreement and concern . . . ."). Tellingly, when given the opportunity to amend their Complaint to cure these (and other) deficiencies, Plaintiffs declined to do so.

On appeal, Plaintiffs do not contest that their Complaint lacked many basic facts about their CWs. Instead, they criticize the District Court for requiring too much detail. Br. 55-56. But it is the PSLRA that requires CW allegations to be presented with sufficient detail and particularity to establish the CWs' knowledge of the matters they allege. *See, e.g.*, *Gray v. LifeLock, Inc. (In re LifeLock, Inc. Sec. Litig.)*, 690 F. App'x 947, 953 (9th Cir. 2017) (discrediting CWs who "fail[ed] to demonstrate the level of detail required to establish personal knowledge of Defendants' alleged state of mind"); *Janas v. McCracken (In re Silicon Graphics Inc. Sec. Litig.)*, 183 F.3d 970, 984 (9th Cir. 1999) (PSLRA's "particularity" requirement demands "great detail"). Plaintiffs' vaguely pleaded CW allegations flout these requirements, and the District Court was correct not to credit them.

### C. Plaintiffs' Other Scienter Theories Fail

Lacking the usual indicia of scienter, Plaintiffs seek to cobble together an inference of fraudulent intent based on the core operations theory, prior litigation,

and changes to Funko's leadership. None suffices, either independently or in combination.

## 1. *Core Operations Theory*

Under the core operations theory, "[a]llegations regarding management's role . . . 'may independently satisfy the PSLRA'" in two circumstances. *Reese v. Malone*, 747 F.3d 557, 575-76 (9th Cir. 2014) (citation omitted), *overruled on other grounds in City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017). First, where such allegations "are particular and suggest that defendants had actual access to the disputed information," they may support an inference of scienter. *Id.* (citation omitted). Second, "in rare circumstances," allegations about management's role "may be sufficient, without accompanying particularized allegations, where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *Id.* at 576. Neither circumstance applies here.

a. <u>No Access To The Disputed Information</u>: First, Plaintiffs fail to establish that the Executive Defendants had access to information contradicting their challenged statements. As the Ninth Circuit has explained, a plaintiff seeking to rely on the core operations theory generally must identify "either specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations . . . or witness accounts demonstrating that executives had

50

actual involvement in creating false reports." *Intuitive Surgical*, 759 F.3d at 1062. Plaintiffs identified neither.

As discussed above, Plaintiffs have abandoned their CWs on appeal. *See supra* at 47-49. But even if they had not, the Ninth Circuit has rejected application of the core operations theory based on "the impressions of witnesses who lacked direct access to the executives but claim that the executives were involved with [company's] day-to-day operations." *Intuitive Surgical*, 759 F.3d at 1062. As the District Court noted, Plaintiffs fail to connect the dots between the generically described CWs and the Executive Defendants, or provide any specific details that might verify their vague claims. ER-34 ("Plaintiffs do not specify the date(s) or number of conversations, the participants, nor the specific contents of any such conversation.").

Moreover, a complaint's allegations must establish more than the executives' "general awareness" of the relevant topic. *Espy v. J2 Glob., Inc.*, 99 F.4th 527, 539 (9th Cir. 2024). As the Ninth Circuit explained in a similar case, even specific "[a]llegations that [the executives] signed off on every acquisition, received detailed reports, or were 'obsessed with numbers,' do not compel a strong inference that they had knowledge of the alleged omitted information about *particular* underperforming acquisitions." *Id.* (emphasis added). At best, Plaintiffs' Complaint establishes only that the Executive Defendants had a general awareness of the importance of

51

inventory health and the infrastructure upgrades—not that they were aware of the particular issues alleged in the Complaint.

On appeal, Plaintiffs primarily rely on what are, at best, second-hand allegations regarding what Sansone supposedly knew. Br. 54. But Sansone is not a defendant, and he did not make any of the challenged statements. As the Ninth Circuit has explained, a plaintiff must show that "*the defendant* acted with the required state of mind." *Walleye Opportunities Master Fund Ltd. v. Silver Lake Grp., L.L.C. (In re Silver Lake Grp., LLC Sec. Litig.)*, 108 F.4th 1178, 1191 (9th Cir. 2024) (emphasis added) (quoting 15 U.S.C. § 78u-4(b)(2)); *see also Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 143 (2011) ("[I]t is the speaker who takes credit—or blame—for what is ultimately said."). Plaintiffs have no basis for seeking to impute Sansone's knowledge to Jung, either as a legal matter or based on their allegations. Indeed, as the District Court explained, Plaintiffs failed to allege that Sansone ever shared any relevant information he may have had with Jung. ER-29. The Court cannot fault Jung for what Sansone allegedly knew. *See Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 607 (9th Cir. 2014) (when Plaintiffs "seek to hold individuals and a company liable on a securities fraud theory, we require that the Plaintiffs allege scienter with respect to each of the individual defendants").

b.  Not The Rare Case:  Second, the Ninth Circuit has repeatedly emphasized that only an "exceedingly rare category of cases" can succeed without particularized allegations of scienter.  *S. Ferry LP, #2 v. Killinger*, 542 F.3d 776, 785 n.3 (9th Cir. 2008).  This is not one of them.  For example, in *Intuitive Surgical*, Plaintiffs claimed that Intuitive Surgical executives had misrepresented the company's financial situation to the public, despite having access to vast undisclosed information, including via internal documents, meetings, and sophisticated proprietary software tracking each use of the company's robotic surgical systems.  759 F.3d at 1055-56. In rejecting an inference of scienter based on the core operations theory, the Ninth Circuit emphasized that it was not "'absurd' to suggest that management was without knowledge of the contents of reports because there are no allegations regarding discussions of the reports' contents—other than that some discussions occurred at some point."  *Id.* at 1063.  So too here, where Plaintiffs allege that Jung paid attention to inventory generally and that "Perlmutter had conversations with the Oracle implementation team."  ER-129 (¶ 149).  Like in *Intuitive Surgical*, it is far from "absurd" to conclude that the Executive Defendants did not know their statements about the progress of the infrastructure projects or their effect on inventory were false at the time they were made.

Similarly, in *Webb v. SolarCity Corp.*, the Ninth Circuit rejected application of the core operations theory in a case alleging that SolarCity executives failed to

53

adhere to accounting protocols and misrepresented its sales margins and income. 884 F.3d 844, 848 (9th Cir. 2018). The Court held that the defendants "concern[] about the performance of the sales division" did not lead to the conclusion that the defendants knew that division's "improved performance *must have been* the result of an accounting error." *Id.* at 857. Again, so too here where Plaintiffs merely speculate that the Executive Defendants *must have* known about the issues at Buckeye and with the Oracle ERP because they paid attention to "the quality of [Funko's] inventory" and described the projects as important to the company's objectives. ER-129, 133 (¶¶ 148, 153(e)). As in *Webb*, Plaintiffs' allegations suggest "only generalized access" to the broad topic areas of inventory and infrastructure developments, not the "actual access" to the specific inventory and infrastructure issues necessary to establish scienter. 884 F.3d at 857; *see* ER-47.

Plaintiffs cite a smattering of cases finding scienter under the core operations theory, but those cases only underscore that this is not the rare case where particularized allegations are unnecessary. Specifically, Plaintiffs rely on *Berson v. Applied Signal Technology, Inc.*, 527 F.3d 982 (9th Cir. 2008). But there, the defendants had failed to disclose four stop-work orders from the company's largest clients that "halted tens of millions of dollars of the company's work," turned one of the company's facilities into "a 'ghost town,'" and had a "devastating effect" on the company's total revenue. *Id.* at 987-88 & n.5 (citation omitted). Under those

54

circumstances, it would be "absurd" to suggest the defendants were not aware of the stop-work orders.

But those facts are nothing like this case. The stop-work orders in *Berson* were discrete, identifiable events with an immediate and catastrophic impact on a company heavily reliant on just two clients that "together account[ed] for 80% of the company's revenue." *Id.* at 984 (describing how a stop-work order meant Applied Signal "immediately cease[d] to earn money"). Here, in contrast, Plaintiffs allege only that some lower-level employees were skeptical of Funko's ability to meet its goals over a period of several months. And unlike *Berson*, where the stop-work orders came from clients that accounted for 80% of the company's revenue, Plaintiffs do not attempt to quantify the impact that either announced write down (of $32.5 million in capitalized costs, and $30-$36 million in inventory, ER-141 (¶¶ 172, 174), had on a company with $1.3 billion in net sales in 2022, SER-92. A mere glance at those figures is enough to demonstrate that it is hardly "absurd" that the Executive Defendants would not have been aware of these issues. Indeed, in *Webb*, the Ninth Circuit rejected application of the core operations doctrine in part because the accounting error at issue affected a division that constituted less than 10% of the company's total installations per year. 884 F.3d at 857. It is no different here, and the core operations theory does not apply.

55

Plaintiffs also rely on *Jaeger v. Zillow Group, Inc.*, 644 F. Supp. 3d 857 (W.D. Wash. 2022). But there, the defendants' claims that they had no knowledge of the workings of a "massive initiative that was known across the entire company" were directly undercut by numerous CW reports and the fact that the CEO had returned specifically to oversee that initiative, which he described as a "watershed" project. *Id.* at 873-75; *see also In re Iso Ray, Inc. Sec. Litig.*, 189 F. Supp. 3d 1057, 1079 (E.D. Wash. 2016) (product at issue "was the only product under development by the Company," unlike here). Again, that case is far afield. Plaintiffs have no serious CW allegations—and have abandoned them in any event—and while the infrastructure projects were surely important, they were not "watershed" projects that were the sole or even central focus of the Executive Defendants. Therefore, the District Court correctly rejected the application of the core operations theory.

### 2. *Prior Litigation*

Next, Plaintiffs attempt to infer scienter from the fact that Funko was a defendant in a previous Exchange Act suit filed three years before this one. Br. 58-60. But the vast majority of the claims in that earlier litigation were dismissed, and it settled for a fraction of its alleged value without any finding of wrongdoing. *See Ferreira v. Funko Inc.*, No. 22-cv-02319, 2021 WL 8820650, at *13-39 (C.D. Cal. Oct. 22, 2021) (dismissing all of plaintiffs' claims except those related to a single challenged statement). As the District Court correctly held, Plaintiffs cannot rely on

56

unrelated, unproven allegations to establish scienter.  ER-51–52.  If they could, plaintiffs could use a meritless lawsuit to bootstrap an argument for "scienter" against any company that has faced a distinct securities lawsuit in the recent past. Plaintiffs cite no Ninth Circuit authority permitting as much.  *See* Br. 58-60.

Instead, Plaintiffs primarily rely on an out-of-circuit district court case, which dealt with vastly different circumstances.  Br. 58-59 (citing *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611 (S.D.N.Y. 2007)).  In *Refco*, which involved one of the largest corporate financial scandals this century, the defendant company had been improperly shifting funds between accounts to hide significant financial losses *for years*.  503 F. Supp. 2d at 619-20.  As evidence of scienter, plaintiffs pointed to the fact that government investigators had previously accused the company of doing exactly that.  *Id.* at 648-49.  In those circumstances, it was eminently reasonable to infer the executive defendants were aware of the long-term financial manipulation. But that sort of repeat, deliberate financial manipulation is worlds away from this case.  Here, there is no history of deliberate fraud that would have put the Executive Defendants on notice that their new infrastructure projects were not going as well as they expected.  And here, the lone prior lawsuit—brought by class action plaintiffs' attorneys, not government officials—was never put to the proof, such that at most Defendants were on notice of "*accusations* of fraud, not fraud itself."  *Pugh v.*

57

*Tribune Co.*, 521 F.3d 686, 695 (7th Cir. 2008). The prior litigation therefore does not come close to establishing scienter.

### 3. *Leadership Changes*

Finally, Plaintiffs point to Jung's departure and Perlmutter's transition from CEO to President as further evidence of scienter. Br. 60-62. But as numerous federal courts have recognized, "notable departures are not in and of themselves evidence of scienter." *Gammel v. Hewlett-Packard Co.*, 905 F. Supp. 2d 1052, 1073 (C.D. Cal. 2012); *see Luna v. Marvell Tech. Grp. Ltd.*, No. 15-cv-5447, 2016 WL 5930655, at *12-13 (N.D. Cal. Oct. 12, 2016) (terminations are insufficient to establish scienter absent "other allegations connecting the departures to the alleged fraud"); *In re Int'l Rectifier Corp. Sec. Litig.*, No. 07-cv-2544, 2008 WL 4555794, at *16 (C.D. Cal. May 23, 2008) (courts typically do not infer scienter from departures absent a "public statement" that the departing individuals "participated or were involved in . . . fraud"). Executives and companies part ways for many reasons, including garden-variety underperformance or a perceived need for change.

Funko's leadership changes in fact support the "contrary inference of nonculpable conduct": when the Executive Defendants' projections proved "far too optimistic," they inevitably faced "personal consequences." ER-53. That is a fact of life in corporate America, not evidence of securities fraud.

Plaintiffs' contrary argument also makes little sense given that both executives continued to work at or with Funko after these changes. Indeed, if Funko had discovered that Perlmutter or Jung had committed securities fraud, it would not have retained Perlmutter as President or asked Jung to provide "transition and advisory services" for two months. SER-89. It would have fired both outright. The far more compelling inference is that Funko concluded that new leadership was necessary, but it valued both executives' contributions and character enough to retain them. The District Court therefore correctly declined to find scienter on this basis.

### 4. *Holistic Analysis*

Considered holistically, Plaintiffs' allegations still fail to establish a strong inference of scienter. Under the holistic review, the court must "take into account plausible opposing inferences" that could weigh against a finding of scienter. *Zucco*, 552 F.3d at 1006 (quoting *Tellabs*, 551 U.S. at 323). Here, even considered together, the allegations "are not as cogent or compelling as a plausible alternative inference" of nonculpable conduct. *Id.* at 1007.

As the District Court explained, Plaintiffs allege that Defendants "intentionally inflated the value of Funko stock" by supposedly hiding dead inventory and challenges affecting the infrastructure projects "while also revealing the truth of the same in a series of partial disclosures." ER-52–53 (citation omitted). This story "does not make sense." *Prodanova*, 993 F.3d at 1107. The Complaint

59

"provides no explanation as to why a company supposedly bent on concealment" would also promptly, and repeatedly, disclose those "same underlying issue[s]," particularly when the individuals responsible for those disclosures had much to lose and nothing to gain from the brief purported cover-up. *Nguyen*, 962 F.3d at 417. It is far more plausible to infer that the Executive Defendants "sincerely believed" in the health of Funko's inventory and financial forecasts and "lacked specific details" about the issues with the infrastructure projects, which they "promptly disclosed . . . once they became apparent." ER-53. And Defendants subsequently faced "personal consequences" for their "far too optimistic" beliefs. *Id.* These "innocent explanations are more plausible" than the convoluted ones suggested by Plaintiffs. *Prodanova*, 993 F.3d at 1113. Dismissal was therefore appropriate.

## III. THE DISTRICT COURT CORRECTLY DISMISSED PLAINTIFFS' SECTION 20(A) CLAIM

Finally, the District Court correctly dismissed Plaintiffs' Section 20(a) claim. That claim requires a predicate Exchange Act violation. *See* 15 U.S.C. § 78t(a); *Inter-Local Pension Fund GCC/IBT v. Deleage (In re Rigel Pharms., Inc. Sec. Litig.)*, 697 F.3d 869, 886 (9th Cir. 2012). Since Plaintiffs failed to plead an underlying Exchange Act violation, the District Court properly dismissed their Section 20(a) claim.

## CONCLUSION

For the foregoing reasons, the Court should affirm the District Court's dismissal of Plaintiffs' Complaint with prejudice.

Dated: December 20, 2024

/s/ David I. Freeburg

David I. Freeburg
Lianna Bash
DLA PIPER LLP (US)
701 Fifth Avenue, Suite
6900 Seattle, WA 98104
(206) 839-4800

Graham Ambrose
LATHAM & WATKINS LLP
200 Clarendon Street
Boston, MA 02116
(617) 948-6000

Respectfully submitted,

Kevin M. McDonough
Thomas J. Giblin
Elizabeth A. Parvis
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

Christine C. Smith
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200

*Counsel for Defendants-Appellees*
*Funko, Inc., Andrew Perlmutter and Jennifer Fall Jung*

62

## STATEMENT OF RELATED CASES

Appellees' counsel is not aware of any related cases pending before this Court.

*/s/* David I. Freeburg
David I. Freeburg

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

**9th Cir. Case Number(s)**  24-4909

I am an attorney for Appellees Funko, Inc., Andrew Perlmutter and Jennifer Fall Jung.

This brief contains 13,986 words, including any words manually counted in any visual images, and excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[  ] is a cross-appeal brief and complies with the word limit of Cir. R. 28.1-1.

[  ] is an amicus brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a death penalty case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [  ] it is a joint brief submitted by separately represented parties;
    [  ] a party or parties are filing a single brief in response to multiple briefs; or
    [  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** */s/* David I. Freeburg          **Date** December 20, 2024

**ADDENDUM**

**Pursuant to 9th Cir. R. 28-2.7**

# STATUTORY ADDENDUM
# TABLE OF CONTENTS

| Description | Page |
|---|---|
| 15 U.S.C. § 78j(b) | ADD-1 |
| 15 U.S.C. § 78t(a) | ADD-2 |
| 15 U.S.C. § 78u-4(b) | ADD-3 |
| 15 U.S.C. § 78u-5 | ADD-6 |

## 15 U.S.C. § 78j

### § 78j. Manipulative and deceptive devices

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

\* \* \*

b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement[1] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

\* \* \*

Rules promulgated under subsection (b) that prohibit fraud, manipulation, or insider trading (but not rules imposing or specifying reporting or recordkeeping requirements, procedures, or standards as prophylactic measures against fraud, manipulation, or insider trading), and judicial precedents decided under subsection (b) and rules promulgated thereunder that prohibit fraud, manipulation, or insider trading, shall apply to security-based swap agreements to the same extent as they apply to securities. Judicial precedents decided under section 77q(a) of this title and sections 78i, 78*o*, 78p, 78t, and 78u-1 of this title, and judicial precedents decided under applicable rules promulgated under such sections, shall apply to security-based swap agreements to the same extent as they apply to securities.

---

[1] So in original. Probably should be followed by a comma.

ADD-1

# 15 U.S.C. § 78t

## § 78t.  Liability of controlling persons and persons who aid and abet violations

## (a) Joint and several liability; good faith defense

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable (including to the Commission in any action brought under paragraph (1) or (3) of section 78u(d) of this title), unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

* * *

ADD-2

## 15 U.S.C. § 78u-4

### § 78u-4. Private securities litigation

\* \* \*

### (b) Requirements for securities fraud actions

#### (1) Misleading statements and omissions

In any private action arising under this chapter in which the plaintiff alleges that the defendant—

(A) made an untrue statement of a material fact; or

(B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

#### (2) Required state of mind

##### (A) In general

Except as provided in subparagraph (B), in any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

##### (B) Exception

In the case of an action for money damages brought against a credit rating agency or a controlling person under this chapter, it shall be sufficient, for purposes of pleading any required state of mind in relation to such action, that the complaint state with particularity facts giving rise to a strong inference that the credit rating agency knowingly or recklessly failed—

(i) to conduct a reasonable investigation of the rated security with respect to the factual elements relied upon by its own methodology for evaluating credit risk; or

(ii) to obtain reasonable verification of such factual elements (which verification may be based on a sampling technique that does not amount to an audit) from other sources that the credit rating agency considered to be competent and that were independent of the issuer and underwriter.

**(3) Motion to dismiss; stay of discovery**

**(A) Dismissal for failure to meet pleading requirements**

In any private action arising under this chapter, the court shall, on the motion of any defendant, dismiss the complaint if the requirements of paragraphs (1) and (2) are not met.

**(B) Stay of discovery**

In any private action arising under this chapter, all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party.

**(C) Preservation of evidence**

**(i) In general**

During the pendency of any stay of discovery pursuant to this paragraph, unless otherwise ordered by the court, any party to the action with actual notice of the allegations contained in the complaint shall treat all documents, data compilations (including electronically recorded or stored data), and tangible objects that are in the custody or control of such person and that are relevant to the allegations, as if they were the subject of a continuing request for production of documents from an opposing party under the Federal Rules of Civil Procedure.

**(ii) Sanction for willful violation**

A party aggrieved by the willful failure of an opposing party to comply with clause (i) may apply to the court for an order awarding appropriate sanctions.

**(D) Circumvention of stay of discovery**

Upon a proper showing, a court may stay discovery proceedings in any private action in a State court, as necessary in aid of its jurisdiction, or to protect or effectuate its judgments, in an action subject to a stay of discovery pursuant to this paragraph.

**(4) Loss causation**

In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages.

* * *

## 15 U.S.C. § 78u-5

**§ 78u-5.  Application of safe harbor for forward-looking statements**

**(a) Applicability**

This section shall apply only to a forward-looking statement made by—

(1) an issuer that, at the time that the statement is made, is subject to the reporting requirements of section 78m(a) of this title or section 78o(d) of this title;

(2) a person acting on behalf of such issuer;

(3) an outside reviewer retained by such issuer making a statement on behalf of such issuer; or

(4) an underwriter, with respect to information provided by such issuer or information derived from information provided by such issuer.

**(b) Exclusions**

Except to the extent otherwise specifically provided by rule, regulation, or order of the Commission, this section shall not apply to a forward-looking statement—

(1) that is made with respect to the business or operations of the issuer, if the issuer—

(A) during the 3-year period preceding the date on which the statement was first made—

(i) was convicted of any felony or misdemeanor described in clauses (i) through (iv) of section 78o(b)(4)(B) of this title; or

(ii) has been made the subject of a judicial or administrative decree or order arising out of a governmental action that—

(I) prohibits future violations of the antifraud provisions of the securities laws;

(II) requires that the issuer cease and desist from violating the antifraud provisions of the securities laws; or

(III) determines that the issuer violated the antifraud provisions of the securities laws;

(B) makes the forward-looking statement in connection with an offering of securities by a blank check company;

(C) issues penny stock;

ADD-6

(D) makes the forward-looking statement in connection with a rollup transaction; or

(E) makes the forward-looking statement in connection with a going private transaction; or

(2) that is—

(A) included in a financial statement prepared in accordance with generally accepted accounting principles;

(B) contained in a registration statement of, or otherwise issued by, an investment company;

(C) made in connection with a tender offer;

(D) made in connection with an initial public offering;

(E) made in connection with an offering by, or relating to the operations of, a partnership, limited liability company, or a direct participation investment program; or

(F) made in a disclosure of beneficial ownership in a report required to be filed with the Commission pursuant to section 78m(d) of this title.

**(c) Safe harbor**

**(1) In general**

Except as provided in subsection (b), in any private action arising under this chapter that is based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading, a person referred to in subsection (a) shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that—

(A) the forward-looking statement is—

(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or

(ii) immaterial; or

(B) the plaintiff fails to prove that the forward-looking statement—

(i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or

(ii) if made by a business entity;[1] was—

    (I) made by or with the approval of an executive officer of that entity; and

    (II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

**(2) Oral forward-looking statements**

In the case of an oral forward-looking statement made by an issuer that is subject to the reporting requirements of section 78m(a) of this title or section 78*o*(d) of this title, or by a person acting on behalf of such issuer, the requirement set forth in paragraph (1)(A) shall be deemed to be satisfied—

    (A) if the oral forward-looking statement is accompanied by a cautionary statement—

        (i) that the particular oral statement is a forward-looking statement; and

        (ii) that the actual results might differ materially from those projected in the forward-looking statement; and

    (B) if—

        (i) the oral forward-looking statement is accompanied by an oral statement that additional information concerning factors that could cause actual results to materially differ from those in the forward-looking statement is contained in a readily available written document, or portion thereof;

        (ii) the accompanying oral statement referred to in clause (i) identifies the document, or portion thereof, that contains the additional information about those factors relating to the forward-looking statement; and

        (iii) the information contained in that written document is a cautionary statement that satisfies the standard established in paragraph (1)(A).

**(3) Availability**

Any document filed with the Commission or generally disseminated shall be deemed to be readily available for purposes of paragraph (2).

---

[1] So in original. The semicolon probably should be a comma.

**(4) Effect on other safe harbors**

The exemption provided for in paragraph (1) shall be in addition to any exemption that the Commission may establish by rule or regulation under subsection (g).

**(d) Duty to update**

Nothing in this section shall impose upon any person a duty to update a forward-looking statement.

**(e) Dispositive motion**

On any motion to dismiss based upon subsection (c)(1), the court shall consider any statement cited in the complaint and any cautionary statement accompanying the forward-looking statement, which are not subject to material dispute, cited by the defendant.

**(f) Stay pending decision on motion**

In any private action arising under this chapter, the court shall stay discovery (other than discovery that is specifically directed to the applicability of the exemption provided for in this section) during the pendency of any motion by a defendant for summary judgment that is based on the grounds that—

(1) the statement or omission upon which the complaint is based is a forward-looking statement within the meaning of this section; and

(2) the exemption provided for in this section precludes a claim for relief.

**(g) Exemption authority**

In addition to the exemptions provided for in this section, the Commission may, by rule or regulation, provide exemptions from or under any provision of this chapter, including with respect to liability that is based on a statement or that is based on projections or other forward-looking information, if and to the extent that any such exemption is consistent with the public interest and the protection of investors, as determined by the Commission.

**(h) Effect on other authority of Commission**

Nothing in this section limits, either expressly or by implication, the authority of the Commission to exercise similar authority or to adopt similar rules and regulations with respect to forward-looking statements under any other statute under which the Commission exercises rulemaking authority.

**(i) Definitions**

For purposes of this section, the following definitions shall apply:

ADD-9

**(1) Forward-looking statement**

The term "forward-looking statement" means—

(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);

(E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or

(F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission.

**(2) Investment company**

The term "investment company" has the same meaning as in section 80a-3(a) of this title.

**(3) Going private transaction**

The term "going private transaction" has the meaning given that term under the rules or regulations of the Commission issued pursuant to section 78m(e) of this title.

**(4) Person acting on behalf of an issuer**

The term "person acting on behalf of an issuer" means any officer, director, or employee of such issuer.

**(5) Other terms**

The terms "blank check company", "roll-up transaction", "partnership", "limited liability company", "executive officer of an entity" and "direct participation investment program", have the meanings given those terms by rule or regulation of the Commission.

ADD-10