No. 24-4909

IN THE
# United States Court of Appeals for the Ninth Circuit

CONSTRUCTION LABORERS PENSION TRUST OF GREATER ST. LOUIS, *et al.*,

*Plaintiffs-Appellants*,

v.

FUNKO INC, *et al.*,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Western District of Washington
No. 2:23-cv-00824-JLR
Hon. James L. Robart

**PETITION FOR REHEARING & REHEARING EN BANC**


KEVIN M. MCDONOUGH
THOMAS J. GIBLIN
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020

CHRISTINE C. SMITH
LATHAM & WATKINS LLP
555 Eleventh Street, NW Suite 1000
Washington, DC 20004

NEAL KUMAR KATYAL
*Counsel of Record*
COLLEEN E. ROH SINZDAK
KRISTINA ALEKSEYEVA
NATALIE NOGUEIRA
MILBANK LLP
1101 New York Ave., NW
Washington, DC 20005
Telephone: (202) 835-7505
nkatyal@milbank.com

*Counsel for Defendants-Appellees*


April 3, 2026

# TABLE OF CONTENTS

Page

INTRODUCTION AND RULE 40(b)(2) STATEMENT ........................................ 1

BACKGROUND ........................................................................................ 3

REASONS FOR REHEARING AND REHEARING EN BANC ........................... 7

I. The Panel's Scienter Holding Conflicts With The Plain Text Of The PSLRA And Decisions Of Other Circuits ................................................ 7

II. The Panel Further Erred By Lowering The Bar For Pleading Falsity Based On Risk-Disclosure Statements .......................................................... 13

CONCLUSION ....................................................................................... 19

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

Page(s)

**CASES:**

*Anderson v. Spirit Aerosystems Holdings, Inc.*,
827 F.3d 1229 (10th Cir. 2016) .......... 11

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) .......... 8, 9

*Bondali v. Yum! Brands, Inc.*,
620 F. App'x 483 (6th Cir. 2015) .......... 14, 16, 17

*Facebook, Inc. v. Amalgamated Bank*,
604 U.S. 4 (2024) .......... 2, 3, 15

*In re Facebook, Inc. Sec. Litig.*,
84 F.4th 844 (9th Cir. 2023) .......... 2, 3, 15, 16

*In re NVIDIA Corp. Sec. Litig.*,
768 F.3d 1046 (9th Cir. 2014) .......... 8

*Ind. Pub. Ret. Sys. v. Pluralsight, Inc.*,
45 F.4th 1236 (10th Cir. 2022) .......... 17

*Karth v. Keryx Biopharmaceuticals, Inc.*,
6 F.4th 123 (1st Cir. 2021) .......... 17, 18

*KBC Asset Mgmt. NV v. DXC Tech. Co.*,
19 F.4th 601 (4th Cir. 2021) .......... 10, 11

*Kolominsky v. Root, Inc.*,
100 F.4th 675 (6th Cir. 2024) .......... 17

*Lormand v. US Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009) .......... 17, 18

*Meitav Dash Provident Funds & Pension Ltd. v. Spirit AeroSystems Holdings, Inc.*,
79 F.4th 1209 (10th Cir. 2023) .......... 10, 11

**TABLE OF AUTHORITIES—Continued**

Page(s)

*Metzler Asset Mgmt. GmbH v. Kingsley*,
928 F.3d 151 (1st Cir. 2019)....12

*MHC Mut. Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P.*,
761 F.3d 1109 (10th Cir. 2014)....11, 12

*Newtyn Partners, LP v. All. Data Sys. Corp.*,
165 F.4th 947 (6th Cir. 2026)....17

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
320 F.3d 920 (9th Cir. 2003)....8

*Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,
58 F.4th 195 (5th Cir. 2023)....12

*Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*,
895 F.3d 933 (7th Cir. 2018)....12, 13

*Prodanova v. H.C. Wainwright & Co.*,
993 F.3d 1097 (9th Cir. 2021)....7, 8

*Rahman v. Kid Brands, Inc.*,
736 F.3d 237 (3d Cir. 2013)....12

*Set Cap. LLC v. Credit Suisse Grp. AG*,
996 F.3d 64 (2d Cir. 2021)....17, 18

*Studen v. Funko, Inc.*,
No. C23-0824, 2024 WL 2209686
(W.D. Wash. May 16, 2024)....5, 10

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007)....1, 7, 13

*Tibbs v. electroCore, Inc.*,
No. 23-2655, 2024 WL 4987243
(3d Cir. Dec. 5, 2024)....12

## TABLE OF AUTHORITIES—Continued

Page(s)

*Williams v. Globus Med., Inc.*,
869 F.3d 235 (3d Cir. 2017). ....................17

*Zhong Zheng v. Pingtan Marine Enter. Ltd.*,
379 F. Supp. 3d 164 (E.D.N.Y. 2019) ....................12, 13

**STATUTES:**

15 U.S.C. § 78u-4(b)(2)(A)....................1, 7, 8

15 U.S.C. § 78u-5(c)(1)(B)(i) ....................3, 18

**LEGISLATIVE MATERIAL:**

H.R. Rep. No. 104-369 (1995) (Conf. Rep.) ....................13

## INTRODUCTION AND RULE 40(b)(2) STATEMENT

Private securities fraud actions "can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007). To curb those abuses, Congress enacted the Private Securities Litigation Reform Act of 1995 (PSLRA), which imposes "[e]xacting pleading requirements" for private securities fraud claims. *Id.* The panel's decision threatens to undo Congress's handiwork by disregarding the PSLRA's plain-text requirements for pleading scienter and permitting plaintiffs to establish falsity based on forward-looking risk disclosures without requiring actual knowledge of falsity. Intervention is urgently needed to correct both errors.

*First*, scienter: The PSLRA imposes a stricter-than-usual standard for pleading scienter, requiring private plaintiffs to "state *with particularity* facts giving rise to a strong inference that the defendant acted with the required state of mind" when he made the allegedly fraudulent misstatements. 15 U.S.C. § 78u-4(b)(2)(A) (emphasis added). Despite this plain text, the panel held that allegations that "are not particularized" can suffice to show scienter under the "core operations doctrine." A43 (quotation marks and citation omitted). That judge-made doctrine provides that a plaintiff can support its allegations of scienter by asserting that defendants made false statements about an issue so "critical to a business's 'core operations' " that the

company's leaders must have known such statements were false. A42 (citation omitted).

Because the core operations doctrine relies on a generalized inference of knowledge, it is on dubious footing even when courts rely on it to bolster other, particularized allegations of scienter. But here, the panel did not require plaintiffs to plead *any* scienter allegations with particularity, holding that Plaintiffs had established scienter "*in the absence of allegations of 'particular facts'*" because the panel believed that Funko's alleged misstatements were "of such prominence that it would be absurd to suggest that management was without knowledge of the matter." A43-44 (emphasis added) (quotation marks and citation omitted).

No other circuit—not even the ones that have otherwise embraced core operations—has gone so far as to dispense with the particularity requirement altogether. This Court should grant rehearing to bring its precedent back into harmony with its sister circuits and the plain text of the PSLRA.

*Second*, risk disclosures: The panel held that a plaintiff can satisfy the PSLRA's requirement to plead falsity by pointing to a company's risk disclosures if those disclosures do not acknowledge relevant current or past events. That holding implicates a clear circuit split regarding when risk disclosures can give rise to securities fraud claims. Indeed, the Supreme Court has already indicated its interest in the split, granting a petition to review this Court's prior decision on the issue in

*In re Facebook, Inc. Sec. Litig.*, 84 F.4th 844 (9th Cir. 2023), and dismissing the petition only after it became clear the question presented did not capture petitioner's argument, *Facebook, Inc. v. Amalgamated Bank*, 604 U.S. 4 (2024); *see* Oral Arg. Tr. 79, 81, 83, No. 23-980 (U.S. Nov. 6, 2024).

Moreover, in the decision below, the panel took this Circuit's outlier position on risk disclosures a step further by holding that a plaintiff can rely on forward-looking risk disclosures even if they are made without "actual knowledge" of their alleged falsity. A34. That holding cannot be reconciled with the PSLRA's safe harbor, which prevents liability for "forward-looking statement[s]" made with appropriate cautions *or* in the absence of "actual knowledge." 15 U.S.C. § 78u-5(c)(1)(B)(i).

The Court should grant rehearing to correct the panel's manifest errors, restore uniformity in the circuits, and enforce Congress's chosen control measures under the PSLRA.

## BACKGROUND

I. Defendant-Appellee Funko Inc. sells pop culture collectibles. A6. During the Covid-19 pandemic, Funko embarked on two major infrastructure projects: replacing its enterprise resource planning software and consolidating five Seattle-area warehouses into a single distribution center in Arizona. A8. Funko

disclosed both projects in its SEC filings and repeatedly warned that its success depended on effective inventory and distribution management. A10, 13, 15-16.

Funko also addressed the risks associated with these projects in the "Risk Factor" sections of its securities disclosures. In a 2022 Form 10-Q, Funko disclosed that "[f]ailure to successfully operate our information systems and implement new technology effectively could disrupt our business or reduce our sales or profitability." A13. In a later form, Funko disclosed that it had "recently experienced canceled orders," and that "if demand or future sales do not reach forecasted levels, we could have excess inventory that we may need to hold for a long period of time, write down, [or] sell at prices lower than expected." A15 (emphasis omitted). Funko even reminded investors that "in the fourth quarter of 2019, we wrote-down $16.8 million of inventory due to our decision to dispose of slower moving inventory" and that the same may come to pass again if Funko is "not successful in managing our inventory." A15 (emphasis omitted).

Shareholder Plaintiffs nevertheless sued Funko, alleging (among other things) that Funko's risk-factor disclosures were false and misleading because they disclosed only potential future risks, even though certain problems with excess inventory and the software upgrade allegedly had begun to materialize when Funko made those statements. A20.

II. The district court promptly dismissed the complaint for failure to plead two key requirements under Section 10(b) of the Exchange Act: that Funko made a material misrepresentation or omission, and that Funko did so with the intent to mislead investors. *Studen v. Funko, Inc.*, No. C23-0824, 2024 WL 2209686, at *7-20 (W.D. Wash. May 16, 2024).

The court found that Funko's risk disclosures were "forward-looking statements" protected by the PSLRA's safe harbor provision. *Id*. at *13. The court also determined that Plaintiffs failed to provide any particularized allegations that Funko's CEO and CFO knew about the inventory and software setbacks and therefore intended to defraud investors. *Id*. at *16-20. Nor was the district court willing to assume that the executives knew of Funko's problems simply by virtue of their position in the company; as the court explained, the specific difficulties that the executives purportedly misrepresented involved the sort of "granular details" that would not have been readily apparent to a CEO or CFO of a *billion-dollar* business. *Id*. at *18 (citation omitted). Judging Plaintiffs' allegations holistically, the court found that it was "more plausible to infer" that Funko's CEO and CFO "lacked specific details about the infrastructural problems unfolding on the ground," "sincerely believed that Funko's inventory was healthy overall," and were simply "too optimistic" in their predictions. *Id.* at *19.

III. A panel of this Court reversed. With regard to the scienter requirement, the panel held that, under the "core operations doctrine," a plaintiff may establish scienter by alleging that an executive's misstatements concerned an issue of such importance to the "core operations" of the company that the executive must have known they were false and made them with the intent to mislead. A42-43. The panel further held that, in "rare circumstances," a plaintiff can rely on the core operations doctrine even "when [the allegations] are not particularized," if "it would be absurd to suggest that management was without knowledge of the matter." A43 (quotation marks and citation omitted). And the panel held that this case is "one of the 'rare circumstances' " in which a plaintiff can establish scienter "in the absence of allegations of 'particular facts' " because the inventory and software projects that were the subject of the alleged misstatements were "essential to Funko's ability to operate and continue to grow as a business." A43-44, 50 (citations omitted).

As for falsity, the panel held that a plaintiff can rely on risk disclosures to establish falsity, and that the PSLRA's safe harbor for "forward-looking statements" does not apply. A30-32. The panel therefore determined that a plaintiff can establish falsity based on a company's risk disclosures without alleging that the company had "*actual* knowledge of [their] falsity." A31. Applying this rule, the panel held that Plaintiffs had adequately alleged falsity with respect to Funko's risk disclosures because, by warning of the risk that Funko could suffer financial harm as a result of

accumulating excess inventory or failing to successfully operate its technology systems, the company had improperly "implied that it was not presently experiencing those issues." A34.

## REASONS FOR REHEARING AND REHEARING EN BANC

### I. The Panel's Scienter Holding Conflicts With The Plain Text Of The PSLRA And Decisions Of Other Circuits.

To establish liability under Section 10(b) and SEC Rule 10b-5, a private plaintiff must prove that the defendant acted with scienter, "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319 (citation omitted). The PSLRA requires plaintiffs to plead scienter allegations "with *particularity*," setting out "facts giving rise to a strong inference that the defendant acted with the required state of mind" "with respect to each act or omission alleged to violate this chapter." 15 U.S.C. § 78u-4(b)(2)(A) (emphasis added). In fact, Congress specifically enacted the PSLRA to "impose[] heightened pleading requirements in actions brought pursuant to § 10(b) and Rule 10b-5" "to curb perceived abuses of the § 10(b) private action." *Tellabs*, 551 U.S. at 320-321 (quotation marks and citation omitted).

The panel ignored the PSLRA's plain-text command that scienter must be pleaded "with particularity," instead holding that a plaintiff's allegations need not be " 'particularized' " in certain cases—like this one—where the judge-made "core operations doctrine" applies. A42-43 (quoting *Prodanova v. H.C. Wainwright &*

*Co.*, 993 F.3d 1097, 1111 (9th Cir. 2021)). The panel cited other cases from this Court that reached the same conclusion. A42-44 (discussing *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982 (9th Cir. 2008) and *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920 (9th Cir. 2003)). No other circuit has embraced such a limitless standard. This Court should grant rehearing to correct the panel's error and eliminate this Circuit's atextual and idiosyncratic exception to the PSLRA.

A. The panel's error began with its reliance on the "core operations doctrine," a "scienter theory" that itself finds no footing in the text of the PSLRA. A42 (quotation marks and citation omitted). Under that theory, a court may "infer[ ] that facts critical to a business's 'core operations' or an important transaction are known to a company's key officers." A42 (quoting *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1063 (9th Cir. 2014)). Because the core operations doctrine relies on a generalized inference of knowledge, it is at odds with the PSLRA's requirement that scienter be pleaded "with particularity." 15 U.S.C. § 78u-4(b)(2)(A).

Other circuits attempt to mitigate that difficulty by insisting that plaintiffs who rely on the core operations doctrine include some minimal degree of particularity in their scienter allegations. But here, the panel dispensed with the particularity requirement altogether, holding that this case presents the "rare circumstances" in which a plaintiff can plead scienter even though "[the allegations] are not

particularized" because the misstatements concern an issue "of such prominence that it would be absurd to suggest that management was without knowledge of the matter." A43 (citation omitted).

That was error because the PSLRA does not describe *any* circumstances in which a plaintiff may disregard the particularity requirement. The panel made no effort to harmonize its holding with the statutory text, relying instead on this Circuit's prior precedents finding the scienter requirement met "in the absence of allegations of 'particular facts.'" A44 (quoting *Berson*, 527 F.3d at 987-988). But circuit precedent cannot trump plain text, and the fact that this Court has disregarded the PSLRA's particularity requirement before reinforces the need for en banc rehearing now.

That is particularly so because the panel relied exclusively on its expansive version of the core operations doctrine to find scienter. Indeed, the panel acknowledged that Plaintiffs had not "affirmatively establish[ed] knowledge on the part of" Funko's CEO and CFO regarding "the inventory and information technology issues" that formed the basis for Plaintiffs' allegations of securities fraud. A49. The panel simply found that omission irrelevant because Plaintiffs' generalized allegations had "raise[d] a strong inference that Defendants would have known of the issues given their importance to Funko's business." A49. Never mind that the district court had found that Plaintiffs' allegations of falsity depended on

"granular details" the executives would have been unlikely to know. A48 (citation omitted). Never mind that Plaintiffs "lack[ ] a coherent theory of motive to defraud." *Studen*, 2024 WL 2209686, at *17. And never mind that the PSLRA requires pleading scienter with particularity, full stop.

B. Unsurprisingly, the panel's approach conflicts with the holdings of every other federal court of appeals to have considered this issue. No other circuit has adopted the panel's atextual exception to the PSLRA's requirement that scienter must be pleaded with particularity. Those circuits that have recognized the core operations doctrine have invariably held that core-operations allegations are at most "relevant to the court's holistic analysis," *KBC Asset Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601, 612 (4th Cir. 2021) (citation omitted), finding that such allegations "contribute to a strong inference of scienter" only if coupled with other particularized facts, *Meitav Dash Provident Funds & Pension Ltd. v. Spirit AeroSystems Holdings, Inc.*, 79 F.4th 1209, 1217 (10th Cir. 2023).

Take the Fourth Circuit's decision in *KBC*. Plaintiffs there did not allege any particularized facts but claimed broadly that "because some of Defendants' alleged misstatements related to [the company's] core operations, Defendants were more likely to know that their statements were false." 19 F.4th at 612. The Fourth Circuit easily rejected those "bare allegations," explaining that defendants' "knowledge of key facts because of their positions or because such knowledge relates to the

business's core operations" is not "enough, standing alone, to support a strong inference of scienter." *Id.* (quotation marks and citation omitted). "Without particularized allegations regarding Defendants' knowledge," the court continued, it would need to "assume scienter because part of [the] business plan was not going smoothly"—precisely the situation the PSLRA was enacted to avoid. *Id.*

The Tenth Circuit similarly requires particularized scienter allegations in the core-operations context. In *Meitav*, the court declined to infer scienter from a CEO's involvement with a core-operations project, holding that "plaintiffs can't rely solely on [the CEO's] active involvement" to show scienter. 79 F.4th at 1222. Although "access to information" "can sometimes *contribute* to a strong inference of scienter," the court emphasized, "plaintiffs would need particularized allegations that, if proven, would show a speaker's knowledge or reckless disregard" of the information. *Id.* at 1216 (emphasis added). Otherwise, "a strong inference of scienter would exist for high-level executives whenever they make a public statement contradicting something in the company's files." *Id.* at 1217; *see also Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1245 (10th Cir. 2016) (courts "cannot infer scienter based only on a defendant's position in a company or involvement with a particular project"; "additional particularized facts are necessary"); *MHC Mut. Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P.*, 761 F.3d 1109, 1122 (10th Cir. 2014) ("nothing in the defendants' routine attendance

at . . . meetings serves to suggest a 'cogent' and 'compelling' inference of scienter" (citation omitted)).

Other circuits have similarly insisted on particularized allegations of scienter, squarely rejecting the suggestion that generalized core operations allegations can ever satisfy the PSLRA's demanding standard. *See, e.g.*, *Tibbs v. electroCore, Inc.*, No. 23-2655, 2024 WL 4987243, at *7 (3d Cir. Dec. 5, 2024) ("general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegations of specific information conveyed to management and related to fraud" (brackets omitted) (quoting *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 247 (3d Cir. 2013)); *Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 219 (5th Cir. 2023) (while core-operations allegations may "contribute to the inference of scienter," they "are not adequate on their own"); *Metzler Asset Mgmt. GmbH v. Kingsley*, 928 F.3d 151, 165 (1st Cir. 2019) (rejecting plaintiffs' argument that "when facts critical to a business's core operations or an important transaction generally are so apparent, knowledge of those facts may be attributed to the company and its key officers, even if those officers did not, in actuality, know the critical information" (citation modified)); *Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 937, 939 (7th Cir. 2018) (observing that "a 'core-operations inference' can support" an inference of scienter but dismissing where plaintiffs made "very few" allegations beyond the core-

operations claims (citation omitted)); *Zhong Zheng v. Pingtan Marine Enter. Ltd.*, 379 F. Supp. 3d 164, 181 (E.D.N.Y. 2019) ("the majority rule is to consider the core operations allegations to constitute supplementary, but not an independent means to plead scienter" (quotation marks and citation omitted)).

* * *

Congress's key purpose in enacting the PSLRA was to "raise[ ] the bar for pleading scienter" and to "promote greater uniformity among the Circuits." *Tellabs*, 551 U.S. at 321 (quotation marks and citation omitted) (citing H.R. Rep. No. 104-369, at 41 (1995) (Conf. Rep.)). The panel's decision turns both of those principles upside down. It allows claims to move forward even where plaintiffs make no particularized allegations of scienter. And it contrasts sharply with the standards in other circuits, incentivizing forum shopping. It is time for the en banc Court to step in.

## II. The Panel Further Erred By Lowering The Bar For Pleading Falsity Based On Risk-Disclosure Statements.

The panel separately erred in holding that Plaintiffs adequately established falsity with respect to Funko's risk disclosures. The panel's holding implicates a well-recognized split regarding when risk disclosures can establish falsity, and the panel exacerbated this Circuit's already outlier view by holding that the PSLRA's safe harbor for forward-looking statements does not apply to risk disclosures. These errors, too, warrant en banc review.

A. Risk disclosures in annual and quarterly reports serve a specific function: They "warn an investor of what harms *may* come to their investment." *Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483, 491 (6th Cir. 2015). Risk disclosures therefore are "inherently *prospective* in nature" and are "not meant to educate investors on what harms are currently affecting the company." *Id.* In that way, risk disclosures differ significantly from other sections of securities disclosures that require the company to provide information about its current status or its recent history.

The disclosures at stake in this case concerned inventory and technology risks that Funko described in detail. Those risk disclosures, for example, explained that "excess inventory" could lead to a "write down" and that "[t]he failure of [Funko's] information systems to perform as designed, [or Funko's] failure to operate them effectively . . . could disrupt [Funko's] business, require significant capital investments to remediate a problem or subject [Funko] to liability." A10, 14. Funko went on to remind investors that the potential of a write-down was very real because the company had been forced to write down "$16.8 million of inventory" in the fourth quarter of 2019 "due to [its] decision to dispose of slower moving inventory." A15. And when Funko was actually forced to write down the value of its inventory due to the materialization of the warned-of risks in March 2023, it promptly disclosed that too. A20. Yet the panel held that Funko's detailed pre-write down

warnings were misleading because an investor might have "drawn the inference" that the company was not presently experiencing any of the inventory and technology problems it described as future risks. A37; *see* A35.

That was error. As Judge Bumatay recently explained, risk disclosures are inevitably forward-looking. *Facebook*, 84 F.4th at 870-871 (Bumatay, J., concurring in part and dissenting in part). Finding them misleading because they do not disclose all the present or past harms that prompted them threatens to make numerous companies liable for correctly disclosing risks when they do not provide a complete history of the reasons for flagging that risk. *Id.* Further, while Judge Bumatay made his statements in partial dissent, his reasoning was so persuasive that the Supreme Court granted certiorari in *Facebook*, dismissing the case only after vehicle problems emerged. *Amalgamated Bank*, 604 U.S. 4; *see* Oral Arg. Tr. 79, 81, 83, No. 23-980 (U.S. Nov. 6, 2024).

Had the panel conducted the "careful reading" of Funko's risk disclosures that Judge Bumatay advocated, *Facebook*, 84 F.4th at 869, it would have rejected Plaintiffs' claims of falsity: Funko's disclosures warned of specific financial risks—that the company may need to "write down" excess inventory, or sell the inventory "at prices lower than expected," and that "[t]he failure of [Funko's] information systems to perform as designed" "could disrupt [its] business" or "require significant capital investments." A14-15. *Those* harms had not materialized when Funko made

its disclosures. On the contrary, Funko did not write down losses associated with the inventory build-up or software issues until March 1, 2023, long after the risk disclosures were made. A20. Even Plaintiffs have never alleged that the write down should have been taken sooner. Under these circumstances, "it's hard to see how the risk factor statements were untrue," *Facebook*, 84 F.4th at 870 (Bumatay, J., concurring in part and dissenting in part), and the panel legally erred in finding otherwise.

B. En banc consideration is also warranted given that the panel's holding implicates a three-way split regarding risk disclosures, in which this Circuit's position is decidedly the weakest.

1. The Sixth Circuit holds that risk disclosures are not misleading merely because they are framed in the future tense or because they omit past and current events. In *Bondali*, for example, plaintiffs alleged that risk disclosures about food safety issues "created a misleading impression: that it was only *possible* for food safety issues to harm investment in [the company] when, in fact, food safety issues had already come to pass and were presently harming investment." 620 F. App'x at 490. The Sixth Circuit disagreed, holding that "cautionary statements are not actionable to the extent plaintiffs contend defendants should have disclosed risk factors are affecting financial results rather than may affect financial results." *Id.* at 491 (quotation marks and citation omitted). The court grounded its conclusion in

the plain meaning of "risk," the broader PSLRA statutory scheme, and the SEC's regulations—which do not require companies to disclose past or present events within their risk disclosure statements. *Id.*; *see also Kolominsky v. Root, Inc.*, 100 F.4th 675, 689 (6th Cir. 2024); *Newtyn Partners, LP v. All. Data Sys. Corp.*, 165 F.4th 947, 964 (6th Cir. 2026).

2. By contrast, the First, Second, Third, Fifth, and Tenth Circuits have held that the failure to disclose a past event can render a risk disclosure misleading—but only if, at the time of the SEC filings, "the adverse effects at issue"—not the underlying conditions—"had in fact been realized" or the harm to the business was "inevitable." *Williams v. Globus Med., Inc.*, 869 F.3d 235, 243 (3d Cir. 2017). The Third Circuit in *Williams*, for example, concluded that plaintiffs failed to establish falsity because the "risk actually warned of"—adverse effects on sales, and not simply the loss of independent distributors—had not materialized "at the time the risk disclosures were made." *Id.* at 242. The Tenth Circuit reached a similar result in *Ind. Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236 (10th Cir. 2022), finding that the risk disclosures were not materially misleading where the specific risks identified were not "virtually certain to occur" and "could still be remedied at the time" the defendant filed its 10-Q forms. *Id.* at 1255-56; *see also Karth v. Keryx Biopharmaceuticals, Inc.*, 6 F.4th 123, 137 (1st Cir. 2021) (statements not materially misleading unless "the alleged risk had a near certainty of causing financial disaster"

at the time of the disclosure (quotation marks and citation omitted)); *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 84-86 (2d Cir. 2021) (same); *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 249-250 (5th Cir. 2009) (same).

3. The panel's decision here goes even further, finding that Funko's risk disclosures were false even though the specific financial harms Funko warned of had not yet occurred and were not yet inevitable, merely because the company did not mention that it had already begun to experience some of the inventory and technology problems the risk disclosures described. *See* A34-35, 37-38.

Moreover, the panel compounded its error by refusing to apply the PSLRA's safe harbor for "forward-looking statements" to Funko's indisputably forward-looking risk disclosures. A30-32. The statutory safe harbor provides that a forward-looking statement cannot be deemed false unless the defendant had "actual knowledge" of the statement's falsity. 15 U.S.C. § 78u-5(c)(1)(B)(i). Yet the panel held that Plaintiffs could plead falsity without alleging Funko's "actual knowledge" because Funko's "disclosure of future risk" functioned "as an observation about the present," such that the safe harbor did not apply. A32. But this disregards the statutory text, which contains no exception for future-focused statements that may be interpreted as conveying information about the present. Indeed, any such exception would swallow the rule because almost every statement about the future

conveys some understanding about the present too. Because the panel ignored this logic and the PSLRA's text, the full Court's intervention is necessary.

## CONCLUSION

The Court should grant rehearing or rehearing en banc and reverse.

Dated: April 3, 2026

Respectfully submitted,

/s/ *Neal Kumar Katyal*

NEAL KUMAR KATYAL
COLLEEN E. ROH SINZDAK
KRISTINA ALEKSEYEVA
NATALIE NOGUEIRA
MILBANK LLP
1101 New York Ave., NW
Washington, DC 20005
Telephone: (202) 835-7505
nkatyal@milbank.com

KEVIN M. MCDONOUGH
THOMAS J. GIBLIN
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020

CHRISTINE C. SMITH
LATHAM & WATKINS LLP
555 Eleventh Street, NW Suite 1000
Washington, DC 20004

*Counsel for Defendants-Appellees*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 11. Certificate of Compliance for Petitions for Rehearing/Responses

*Instructions for this form: https://www.ca9.uscourts.gov/forms/form11instructions.pdf*

**9th Cir. Case Number(s)** 24-4909

I am the attorney or self-represented party.

I certify that pursuant to Circuit Rule 40-1, the attached petition for panel rehearing/petition for rehearing en banc/response to petition is *(select one)*:

◉ Prepared in a format, typeface, and type style that complies with Fed. R. App. P. 32(a)(4)-(6) and **contains the following number of words:** 4,200 **.**
*(Petitions and responses must not exceed 4,200 words)*

**OR**

○ In compliance with Fed. R. App. P. 32(a)(4)-(6) and does not exceed 15 pages.

**Signature** s/Neal Kumar Katyal **Date** 04/03/2026
*(use "*s/[typed name]*" to sign electronically-filed documents)*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS on April 3, 2026.

I certify that all participants in the case are registered ACMS users and that service will be accomplished by the ACMS.

April 3, 2026

*/s/ Neal Kumar Katyal*
Neal Kumar Katyal

*Counsel for Defendants-Appellees*

# ADDENDUM

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| CONSTRUCTION LABORERS PENSION TRUST OF GREATER ST. LOUIS, Lead Plaintiff; PAUL HADDOCK,<br><br>*Plaintiffs - Appellants*,<br><br>and<br><br>JONATHAN STUDEN,<br><br>*Plaintiff*,<br><br>v.<br><br>FUNKO INC; ANDREW PERLMUTTER; JENNIFER FALL JUNG,<br><br>*Defendants - Appellees*. | No. 24-4909<br><br>D.C. No. 2:23-cv-00824-JLR<br><br>OPINION |

Appeal from the United States District Court
for the Western District of Washington
James L. Robart, District Judge, Presiding

Argued and Submitted May 23, 2025
San Francisco, California

Filed February 4, 2026

Before: Marsha S. Berzon, Michelle T. Friedland, and Salvador Mendoza, Jr., Circuit Judges.

Opinion by Judge Mendoza

## SUMMARY*

### Securities Fraud

The panel affirmed in part and reversed in part the district court's dismissal, for failure to state a claim, of an action under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 against Funko, Inc., and two of its officers.

Funko's share price lost more than half its value when millions of its pop culture collectibles were written off at a loss of tens of millions of dollars. Funko shareholders alleged that defendants misled investors as to the progress of a major warehouse relocation, the quality and management of the company's inventory, its use and upgrade of information technology, and its distribution capabilities. The district court dismissed the complaint for failing to sufficiently allege falsity and scienter.

The panel held that to establish falsity, securities plaintiffs may rely on either an affirmative misrepresentation

* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

theory or an omission theory. An allegedly misleading statement must be capable of objective verification. Scienter means the intent to mislead investors or deliberate recklessness to an obvious danger of misleading investors.

The panel affirmed the district court's dismissal with respect to the falsity of affirmative statements regarding distribution center operations in Buckeye, Arizona, and the quality of Funko's inventory, and Funko's distribution capabilities, as well as risk factor statements in SEC filings regarding Funko's upgrade of technology. The first group of statements were not demonstrably false, and to the extent that defendants embellished the quality of inventory, these statements were "puffery." The risk disclosures concerning upgrade of technology also were not false.

The panel reversed as to the falsity of risk factor statements in SEC filings regarding Funko's inventory management and the company's use of its existing information technology systems, as well as with respect to scienter regarding the falsity of those statements. The risk disclosures concerning inventory management were not "forward-looking statements" protected by the safe harbor provision of the Private Securities Litigation Reform Act. Plaintiffs pleaded with sufficient particularity factual allegations regarding the falsity of risk disclosures concerning existing technology. As to scienter, the panel concluded that a reasonable trier of fact could find that it would be absurd to believe that the defendant officers did not know that their statements related to Funko's inventory and information technology system were misleading at the time they were made.

The panel also reversed as to plaintiff's § 20(a) control liability claim. The panel remanded the case to the district court.

## COUNSEL

Andrew S. Love (argued), Robbins Geller Rudman & Dowd LLP, San Francisco, California; Hillary B. Stakem, Ting H. Liu, and Jessica E. Robertson, Robbins Geller Rudman & Dowd LLP, San Diego, California; Gretchen F. Cappio, Matt Melamed, and Garrett Heilman, Keller Rohrback LLP, Seattle, Washington; for Plaintiffs-Appellants.

Kevin M. McDonough (argued), Thomas J. Giblin, and Elizabeth A. Parvis, Latham & Watkins LLP, New York, New York; Christine C. Smith, Latham & Watkins LLP, Washington, D.C.; Graham Ambrose, Latham & Watkins LLP, Boston, Massachusetts; David I. Freeburg and Lianna Bash, DLA Piper LLP (US), Seattle, Washington; for Defendants-Appellees.

**OPINION**

MENDOZA, Circuit Judge:

Not all misfit toys are lucky enough to be spirited away to happy homes by a red-nosed reindeer on Christmas. Rudolph the Red-Nosed Reindeer (NBC television broadcast, aired Dec. 6, 1964). In our world, unwanted stock is often labeled "dead inventory" and discarded. Such is the story of millions of misfits produced by Funko, Inc. ("Funko" or "the Company"), which were written off at a loss of tens of millions of dollars in November 2022.

After news of the write off broke, Funko's share price lost more than half its value. Funko's shareholders sued the Company, its then-Chief Executive Officer Andrew Perlmutter ("CEO Perlmutter"), and then-Chief Financial Officer Jennifer Jung ("CFO Jung") under the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a). The shareholders alleged that the Company and its officers misled investors as to the progress of a major warehouse relocation, the quality and management of its inventory, its use and upgrade of information technology, and its distribution capabilities.

To survive dismissal in a suit under the Exchange Act, Plaintiffs must allege, among other elements, that Defendants made a "material misrepresentation or omission" (what we in this opinion call "falsity"), and that they did so with the "intent to mislead investors" or with "deliberate recklessness to an obvious danger of misleading investors" (what we call "scienter"). *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 764–65 (9th Cir. 2023) (quotation marks omitted). Further, such claims are evaluated under a heightened pleading standard—plaintiffs

must allege "the who, what, when, where, and how of the misconduct charged." *In re Cloudera, Inc. Sec. Litig.*, 121 F.4th 1180, 1187 (9th Cir. 2024) (quotation marks omitted). The district court dismissed Plaintiffs' complaint for failing to sufficiently allege falsity and scienter. We affirm in part and reverse in part.

## I.

Funko sells pop culture collectibles, including the popular FunkoPop! vinyl figurines that depict superheroes, wizards, villains, and other protagonists and minor characters from the public's favorite fandoms. Funko's president, Perlmutter, was promoted to CEO and joined the company's Board of Directors in January 2022. Jung became Funko's CFO in August 2019. Plaintiffs are Construction Laborers Pension Trust of Greater St. Louis ("Pension Trust") and Paul Haddock, both of whom purchased Funko Class A common stock between March 3, 2022, and March 1, 2023 ("Class Period"). They allege and argue that Defendants misled them into purchasing the stock at an artificially inflated price and bring Exchange Act claims on behalf of all others similarly situated. The operative complaint sets out the following factual allegations, which we presume at the motion to dismiss stage to be true. *Cloudera*, 121 F.4th at 1186.

### A.

Funko sells products for "evergreen" intellectual properties ("IPs") that are always en vogue, like Darth Vader or Harry Potter, and "current release" IPs, whose popularity comes and goes—Baby Yoda, for example. In 2021, Funko had licenses for more than 900 IPs. If an IP license expires or is otherwise terminated, Funko cannot sell products

featuring that IP, even if it has a surplus of that product in its warehouses.

A key feature of Funko's business model is its ability to ride the ever-changing wave of pop culture trends. Funko strikes while the iron is hot, boasting the ability to go from design to shelf in 110 to 200 days. IP holders give Funko insight into movie release schedules, so products with new IP are on the shelf by opening day. But given the fickle nature of pop culture, after an IP falls out of favor (or fails to gain traction in the first place), Funko products may wind up as "dead inventory"—unsellable figurines that take up Funko's limited warehouse space.

Storing dead inventory also costs money, so Funko's business model requires careful market forecasting and inventory management. Failing to do the forecasting and management adequately can cause significant problems. In one 2019 incident, Funko accumulated 10 to 12 million units of dead inventory. The dead inventory clogged a warehouse, which resulted in hundreds of shipping containers with new product sitting in the parking lot, the lease of a new warehouse, and an eventual write-down of $16.8 million to dispose of the dead inventory. Funko's share price fell 40% in a single day when news of the write-down broke.

Given the importance to its business of effectively managing inventory, Funko's leadership discussed inventory needs and availability at monthly Sales Operations meetings. CEO Perlmutter and CFO Jung attended these meetings, as did members of the Sales and Operations Planning group (who reported to CFO Jung), the Sales team (which CEO Perlmutter was involved with), and the Fulfillment Operations group (led by Chief Operating Officer Joe Sansone ("COO Sansone")). Funko tracked

inventory, sales, distribution, and other data with information systems including its enterprise resources planning ("ERP") software Microsoft NAV, which enabled leadership to decide what products to prioritize, send to retailers, and so on.

**B.**

Funko experienced exceptional sales growth, fueled by popular demand for its products amidst the COVID-19 pandemic. But growth requires investment. Funko outgrew its ERP software and, in 2020, started planning an ERP upgrade to the "Oracle platform." Microsoft NAV was designed for small and mid-sized companies and was failing to meet Funko's growing needs. For example, employees on the Sales and Operations Planning group had to turn to Microsoft Excel for analytics instead of using Microsoft NAV. With Oracle, data from various groups inside the company would be better integrated and more useful. But the transition would be a significant endeavor, involving third-party contractors, a dedicated manager, and eventually, personal oversight by COO Sansone.

Funko also needed more space. In September 2021, Funko leased an 860,000 square foot warehouse and distribution center in Buckeye, Arizona ("Buckeye DC"), with an occupancy term to begin April 1, 2022. Buckeye DC was to be run by a director who reported to COO Sansone. It would be designed with the Oracle ERP's integration in mind and would employ high-tech equipment. With Oracle, employees would be able to scan and verify inventory coming off of trucks at Buckeye DC and immediately know where it should go in the warehouse. The software would also allow employees to find products to fulfill orders more seamlessly. Funko's leadership met with warehouse

supervisors and managers throughout 2021 to plan the Buckeye DC project, integrate Oracle, and review Oracle test modules for the new warehouse.

By 2022, the Oracle project remained in progress. To transition to the Oracle ERP, Funko's data needed to be "clean[ed]"—that is, reformatted and recategorized in a manner that Oracle could use. But Funko lacked "data governance," meaning a system of controls to ensure consistency in its data. And deep disagreements in leadership and turnover in management resulted in confusion about the project's direction. In January or February 2022, an employee told CFO Jung that the Oracle transition project was not going well and was unlikely to be completed on time. Around the same time, IT systems and logistics employees in Funko's United Kingdom office warned that it was "quite clear" the Oracle project was "not in a good place" given the lack of clear management or vision. As late as January 2022, IT management did not have any timeline for employees as to when Oracle would go live.

**C.**

In their operative complaint and in the briefing in the district court, Plaintiffs highlighted many of Defendants' public statements during the Class Period that they contended were false or misleading. Plaintiffs narrow their theories of liability on appeal. We limit our review to only those statements identified in the briefing before us. *See Indep. Towers of Washington v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) ("[W]e 'review only issues which are argued specifically and distinctly in a party's opening brief.'" (quoting *Greenwood v. Fed. Aviation Admin.*, 28 F.3d 971, 977 (9th Cir. 1994)). On March 3, 2022, Funko

filed with the Security and Exchange Commission ("SEC") a Form 8-K for the fourth quarter of 2021 ("4Q21"; other quarters will be denoted similarly), and a Form 10-K for fiscal year 2021 ("FY21").[1] CEO Perlmutter and CFO Jung signed and certified the Form 10-K. The Form 10-K disclosed certain "Risk Factors" including the following:

> Our success depends, in part, on our ability to successfully manage our inventories. We must maintain sufficient inventory levels to operate our business successfully, but we must also avoid accumulating excess inventory, which increases working capital needs and lowers gross margin.
>
> If demand or future sales do not reach forecasted levels, we could have excess inventory that we may need to hold for a long period of time, write down, sell at prices lower than expected or discard. For example, in the fourth quarter of 2019, we wrote-down $16.8 million of inventory due to our decision to dispose of slower moving

[1] Form 10-Ks are filed annually by most publicly traded companies, a requirement under rules set forth by the Securities and Exchange Commission (SEC). They detail a company's financial and business information. *See How To Read a 10-K*, U.S. Sec. & Exch. Comm'n (July 1, 2011), https://www.sec.gov/answers/reada10k.htm. Form 8-Ks, on the other hand, are only filed when there is a triggering event, such as management change or certain cybersecurity incidents. The SEC requires that Form 8-Ks be filed within four days of the triggering event. *See Exchange Act Form 8-K Questions and Answers of General Applicability*, U.S. Sec. & Exch. Comm'n (June 24, 2024), https://www.sec.gov/rules-regulations/staff-guidance/compliance-disclosure-interpretations/exchange-act-form-8-k.

> inventory to increase operational capacity which contributed to the Company's net loss for the period.

On an earnings call on March 3, 2022, CFO Jung indicated that costs were expected to be elevated in the first half of the year, given the move to Buckeye DC and the Oracle upgrade. She said, "[w]e will probably launch in the beginning early [in] the Q3 for the ERP [(meaning Oracle)], but the distribution center move will happen in the first half." At the time, employees were skeptical that Oracle could be operative by early Q3. There would also need to be substantial construction and outfitting work at Buckeye DC to make it operational after the lease began on April 1, 2022.

On April 4, 2022, Buckeye DC opened for management employees, who came to Arizona from Washington to begin work. Much was to be done, including building storage racks and offices and equipping loading bays to receive product. Workers began training in late April. Issues with equipment were immediately evident, including that the conveyor belt system was too tall for most employees to use. Inventory began to arrive from Funko's Washington warehouses in April, when only 12 of the anticipated 84 loading bays were operable. Funko used rented trailers to deliver inventory, and so incurred added costs when there were delays unloading them. When shipments first arrived, workers had not yet been trained or given operating procedures for unloading incoming inventory. One worker reported that he and other prospective employees were asked during interviews to begin work immediately to help unload incoming trucks. Workers were told to put inventory on any open racks, without any scanning or tracking. One Operations Lead saw that incoming inventory was being

placed in the warehouse without review by stockers of shipping documentation or inventory count checks; he reported to management that the gaps would be a problem if not addressed.

Adding to the chaos, when shipping documentation was reviewed, it often revealed that incoming trailers were missing product, had extra product, or had the wrong product. Workers at Buckeye DC were directed to update Microsoft NAV to reflect the product that was actually received, which changed inventory counts in the system and made tracking inventory "nearly impossible." An Operations Lead reported that workers had to deal with 50 "investigations" per day to find product misplaced in the warehouse. That Operations Lead wrote a letter to an Operations Manager describing the issues he saw, and, after returning to Washington, relayed his concerns to Senior Director of Fulfillment Operations Dave Tarnosky. Tarnosky worked under Vice President of Operations Alex Poole and COO Sansone. If Oracle had been operational, workers would have scanned incoming product, Oracle would have told the workers where to put it, and workers would have scanned the storage rack to confirm the inventory's location in the system. Instead, workers were forced to use Excel spreadsheets and handwritten notes to track inventory**.**

By the end of May, Buckeye DC's storage racks were full. Disorganized inventory was stacked on the floor and went untracked in any identification system. Workers spent hours trying to find product that had been placed on the floor in this haphazard manner, causing order fulfillment backup. An Operations Manager estimated that half of the inventory from Washington had been misplaced in the warehouse. In addition, Funko had not destroyed any dead inventory in two

years, meaning it was beginning to pile up and comprised a quarter of one of Funko's Washington warehouses. Funko's management decided to move dead inventory to Buckeye DC rather than identify and destroy it. One warehouse supervisor estimated that 30% of the inventory sent to Buckeye DC was dead.

On May 5, 2022, Funko filed with the SEC a Form 10-Q for 1Q22, which CEO Perlmutter and CFO Jung signed and certified.[2] The Form 10-Q included "Risk Factors" and reiterated the risk disclosure from the March 3 Form 10-Q concerning inventory management. It included the following additional "Risk Factor":

> Failure to successfully operate our information systems and implement new technology effectively could disrupt our business or reduce our sales or profitability.
>
> We rely extensively on various information technology systems and software applications, including our enterprise resource planning software, to manage many aspects of our business, including product development, management of our supply chain, sale and delivery of our products, financial reporting and various other processes and transactions. We are critically dependent on the integrity, security and consistent operations of these systems and related back-up systems.

[2] The Form 10-Q is a quarterly report that certain securities issuers are required to file with the SEC under the Exchange Act. 17 C.F.R. § 240.13a-13.

> . . .
>
> The failure of these information systems to perform as designed, our failure to operate them effectively, or a security breach or disruption in operation of our information systems could disrupt our business, require significant capital investments to remediate a problem or subject us to liability. We are also in [sic] process of upgrading our enterprise resource planning software globally, beginning in the United States. If the potential upgrades are not successful or result in delays, our business could be disrupted or harmed.

Funko held an earnings call the same day, in which CFO Jung explained that costs would remain high through the first half of the year, and that "we did launch the new [distribution center] in April, and the ERP is set to come out at the end of the [(second)] quarter." At the time, certain employees felt Oracle would not be functional by June (the end of the second quarter) and commented that CFO Jung's statement "was a weird thing to say." But analysts who reported on Funko took CFO Jung's statement at face value, writing that "the [selling, general, and administrative] expense ratio will be up sequentially due to the one-time spending, which should be complete by the end of 2Q22."

In June, Poole, the Vice President of Operations who had been responsible for the new warehouse, quit. COO Sansone began visiting Buckeye DC for at least a week per month, taking charge of the project. The build-out was ongoing and necessary equipment was still being acquired. Storage racks were filled as soon as they went up, and the warehouse was

operating at over 95% capacity. The inventory tracking problems continued; the number of investigations to find lost inventory increased to 120 per day.

By late June and early July, incoming shipping containers that had been delayed due to COVID-19-related supply chain slowdowns began arriving, further clogging the warehouse. With nowhere to put the product, Funko stacked between 300 and 500 rented shipping containers in the parking lot during 3Q22, accruing late fees as the FunkoPop!s baked in the Arizona sun.

On August 4, 2022, Funko filed with the SEC a Form 10-Q for 2Q22, which CEO Perlmutter and CFO Jung signed and certified. It disclosed a "Risk Factor" concerning managing inventory levels nearly identical to the March 3 and May 5 filings, with additions that we emphasize here:

> [W]e must also avoid accumulating excess inventory, which increases working capital needs and lowers gross margin . . . . *We have recently experienced canceled orders and* if demand or future sales do not reach forecasted levels, we could have excess inventory that we may need to hold for a long period of time, write down, sell at prices lower than expected or discard. For example, in the fourth quarter of 2019, we wrote-down $16.8 million of inventory due to our decision to dispose of slower moving inventory to increase operational capacity which contributed to the Company's net loss for the period. *If we are not successful in managing our inventory, our business,*

> *financial condition and results of operations could be adversely affected.*

That same August 4, 2022 Form 10-Q also included a "Risk Factor" concerning the operation and upgrade of Funko's information technology, nearly identical to the Risk Factor identified in the May 5, 2022, Form 10-Q concerning the same, with two changes emphasized here:

> *The efficient operation and successful growth of our business depends on these information systems, including our ability to operate and upgrade them effectively and to select and implement adequate disaster recovery systems successfully.* . . . We are also in process of upgrading our enterprise resource planning software globally, beginning in the United States. *In August 2022, we announced that we are delaying the remaining steps for implementation of our enterprise resource planning software to 2023.* If the potential upgrades are not successful or result in further delays, our business could be disrupted or harmed.

The Form 10-Q told investors that Funko expected costs "to remain elevated through at least the end of 2022 to support the final transitions of [its] U.S. distribution warehouses" and that the Company expected "to finalize the remaining steps" of the Oracle upgrade "in early 2023." And in a Form 8-K filed the same day, signed by CFO Jung, Funko reported that inventories were inflated over the prior year due to "receipt of delayed inventory as pandemic-related supply

chain disruptions began to improve toward the end of the quarter."

Also on August 4, 2022, Funko held an earnings call with investors and analysts. CFO Jung, speaking about the switch to Oracle, explained that "we recently made the difficult decision to delay the remaining steps until 2023" due to "a number of factors," but "ultimately, we did not want to impair the momentum that we have today by shifting to a platform that we felt wasn't yet fully ready to support our business." Discussing Funko's inventory levels, she explained that "[w]hile our inventory levels are up year-over-year, we believe that inventory is generally high quality and leave[s] us well positioned to meet our consumer demand and support our strong second half growth forecast." An analyst asked CFO Jung about the inventory, and she explained:

> [I]n Q4 [we] had a lot of delays that rolled into Q1 just due to the congestion within the supply chain. And you're seeing a little bit of that in Q2 as well. Although as we're now looking into the back half of the year, we feel the inventory is in a really good healthy position, and we're poised to deliver on our back half results. It was really about just managing through the congestion that we saw so far. Knowing that, we're seeing those transit times come down and delivery dates to be more on time than they had earlier in the year. So there is a large portion of the in-

> transit, but we're working to get that into the DC and get that out to our customers.

Another analyst asked CFO Jung about Funko's "cash flow," and she replied:

> What you're seeing underneath the covers there [are] a couple high [uses] of cash, whether it be the distribution center, that was a major feat to get that up and running . . . then we had the inventory that came in all at once as you got in Q4 inventory, Q1 inventory. And so . . . inventory and some of the uses of cash is what you're seeing.

Following the call, Funko's share price dropped 18%.

In August 2022, the warehouse lagged 50 days behind on order fulfillment. In September, the Sales team had difficulty meeting sales quotas due to missing product and product shortages. The product that sat in shipping containers was not listed as available and would not be listed as available until it was unloaded in the warehouse. All the while the busy holiday season approached.

Operations at Buckeye DC floundered: the warehouse lacked appropriate equipment, product on the top shelf could not be reached in a timely manner, and the conveyor belts (designed for the yet-to-be-launched Oracle) laid inoperable. Funko began to ship partial orders. Retail customers started to cancel orders, particularly those for product with current-release IP that was so delayed it was no longer considered "new." In one case, a retailer needed Valentine's Day product shipped by October but was told it would not be shipped until the following May.

On September 13, 2022, Funko held a "Press and Investor Day." An investor asked CFO Jung, "[c]an you help us quantify how much investment is needed for that internal growth, or how much internal investment is needed for the growth?" CFO Jung responded by explaining that, "[o]bviously, down the road, we'll eventually need probably more distribution capabilities to continue [to] support the growth, but that's more of a future down the road within the 5-year plan, but not directly related within the next, call it, 12 months or so."

That autumn, Buckeye DC's parking lot sat full of inaccessible Halloween and Christmas product. By the end of September, Funko hired a third-party logistics company to store slow and dead inventory elsewhere in Arizona. That warehouse filled up within a few months, so Funko rented another.

On November 3, 2022, Funko filed with the SEC a Form 10-Q for 3Q22, signed and certified by CEO Perlmutter and CFO Jung. This 10-Q included a "Risk Factor" concerning inventory management with language identical to that in the August 4, 2022, Form 10-Q. It did not include a risk factor concerning information technology.

Funko held an earnings call the same day. CEO Perlmutter told investors and analysts that Buckeye DC was designed for Oracle and running it without Oracle caused "higher-than-expected short-term operating expenses." CFO Jung said that the higher expenses were primarily due to labor and machinery costs to move the product. Though the inventory levels were 88.7% higher than a year prior, CFO Jung reiterated that the inventory was "generally high quality."

The revelations caused a stir among analysts, who noted that they "believe a credibility issue could weigh on shares over the foreseeable future," and that "it feels like we were hit with a bomb." Funko's share price dropped 59% the following day. In December 2022, Perlmutter was demoted back to President and CFO Jung stepped down. In March 2023, the Company announced it was abandoning the Oracle project and writing down $32.5 million in associated costs and between $30 and $36 million in inventory to "manag[e] inventory levels to align with the operating capacity of [its] distribution center." Also in March, Buckeye DC workers finally unloaded Christmas-themed inventory, which had been sitting in the parking lot for months.

**D.**

Jonathan Studen, formerly a named plaintiff, filed a putative class action complaint in June 2023. That summer, the district court granted the Pension Trust's motion to be appointed lead plaintiff. The Pension Trust filed an amended complaint on behalf of itself and Paul Haddock, asserting that Funko, CEO Perlmutter, and CFO Jung violated Section 10(b) of the Exchange Act and SEC Rule 10b-5, and seeking to hold the same Defendants liable as control persons under Section 20(a). 15 U.S.C. §§ 78j(b), 78t(a); 17 C.F.R. 240.10b-5. Specifically, they asserted that, during the class period, Defendants' statements misrepresented the status of its inventory management, distribution capabilities, and use of information technology systems. They further asserted that Defendants acted with scienter when making these allegedly false or misleading statements. Defendants moved to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, which the district court granted in May 2024. The district court also granted Plaintiffs leave to

amend. Plaintiffs declined to amend and instead pursued this appeal.

## II.

We review a district court's dismissal under Rule 12(b)(6) de novo. *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017). Typically, a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Cloudera*, 121 F.4th at 1186 (quoting Fed. R. Civ. P. 8(a)(2)). To survive a motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

In addition, a complaint attempting to state a claim for fraud must meet Rule 9(b)'s heightened pleading standard. Fed. R. Civ. P. 9(b); *Glazer*, 63 F.4th at 765. Rule 9 requires a plaintiff alleging fraud to "state with particularity the circumstances constituting fraud." *Glazer*, 63 F.4th at 765 (quoting Fed. R. Civ. P. 9(b)). "To properly plead fraud with particularity under Rule 9(b), 'a pleading must identify the who, what, when, where, and how of the misconduct charged.'" *Cloudera*, 121 F.4th at 1187 (citation omitted).

A plaintiff initiating a cause of action pursuant to the Exchange Act must also meet the Private Securities Litigation Reform Act's ("PSLRA") pleading standards. 15 U.S.C. § 78u-4; *Cloudera*, 121 F.4th at 1187. Section 10(b) of the Exchange Act prohibits "'manipulative or deceptive' practices in connection with the purchase or sale of a security." *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 947 (9th Cir. 2023) (citing 15 U.S.C. § 78j(b)). SEC Rule 10b-5 prohibits making "any untrue statement of a material fact" or omitting material facts "necessary in order to make the

statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). The PSLRA requires that an Exchange Act plaintiff set out in their complaint each statement alleged to be misleading, and the "reason or reasons why the statement is misleading," 15 U.S.C. § 78u-4(b)(1), as well as "facts giving rise to a strong inference that the defendant acted with the required state of mind," *Quality Sys.*, 865 F.3d at 1140. This is an "exacting standard, under which a litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false, is insufficient." *Cloudera*, 121 F.4th at 1187 (citation modified).

Importantly, the PSLRA "did not impose an insurmountable standard." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012). "The PSLRA was designed to eliminate frivolous or sham actions, but not actions of substance." *Glazer*, 63 F.4th at 769 (quoting *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1235 (9th Cir. 2004)). A complaint's factual allegations remain entitled to a presumption of truth, *Facebook*, 87 F.4th at 947; *Quality Sys.*, 865 F.3d at 1136, and an Exchange Act claim survives dismissal if the factual allegations in the complaint "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Glazer*, 63 F.4th at 763 (quoting *Iqbal*, 556 U.S. at 678).

**III.**

A plaintiff asserting a claim under Section 10(b) and Rule 10b-5 must allege "(1) a material misrepresentation or omission by the defendant [("falsity")]; (2) scienter; (3) a connection between the misrepresentation or omission and

the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Glazer*, 63 F.4th at 764 (quoting *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014)). "Section 20(a) imposes liability on a person who is in control of the person who is directly responsible for a securities fraud violation." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 701–02 (9th Cir. 2021). Section 20(a) claims are derivative and require an underlying violation of the statute. *Id.* (quoting 15 U.S.C. § 78t(a)).

The district court dismissed the complaint for failure to sufficiently allege falsity and scienter. Before we turn to Plaintiffs' arguments, we note that we remain at the pleading stage. We are therefore required to afford the allegations in the complaint reasonable inferences and presume their truth. *Facebook*, 87 F.4th at 948; *Quality Sys.*, 865 F.3d at 1136. Where we can "draw the reasonable inference" of falsity or scienter, the claims survive. *Glazer*, 63 F.4th at 763. Our analysis is limited solely to whether Plaintiffs' allegations are sufficiently plausible and particular to survive a motion to dismiss. Whether Plaintiffs can recover will require resolution of factual questions by a trier of fact.

Because "generally 'a federal appellate court does not consider an issue not passed upon below,'" we limit our review only to the falsity and scienter elements: the two grounds upon which the district court dismissed Plaintiffs' complaint. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018) (quoting *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008)) (limiting review solely to elements of falsity and materiality).

**A.**

We begin with falsity. To establish falsity, "securities plaintiffs may rely on either an affirmative misrepresentation theory or an omission theory." *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1188 (9th Cir. 2021) (citing 17 C.F.R. § 240.10b-5(b)). "An allegedly misleading statement must be 'capable of objective verification,'" *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 619 (9th Cir. 2022) (quoting *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014)), and "[w]e apply the objective standard of a 'reasonable investor' to determine whether a statement is misleading." *Alphabet*, 1 F.4th at 699 (quoting *VeriFone*, 11 F.3d at 869).

Plaintiffs argue that their allegations establish falsity as to some of Defendants' public statements throughout the Class Period: (1) statements descriptive of the state of the Buckeye DC's operations and the quality of Funko's inventory; (2) "Risk Factor" statements regarding Funko's inventory management made in Funko's SEC filings on March 3, 2022; May 5, 2022; August 4, 2022; and November 3, 2022; (3) "Risk Factor" statements regarding Funko's use and upgrade of information technology made in Funko's SEC filings on May 5, 2022, and August 4, 2022; and (4) statements regarding Funko's distribution capabilities made on September 13, 2022. We consider each of Plaintiffs' falsehood allegations in turn.

**i.**

The first batch of allegations is somewhat sprawling: Plaintiffs' complaint highlights Funko's August 4, 2022 Form 10-Q, in which the company stated that it expected costs to "remain elevated" to "support the final transitions of [its] U.S. distribution warehouses." In its Form 8-K filed

that same day, Funko explained that inventory levels were high because the pandemic-delayed shipments were finally arriving. During the earnings call that same day, CFO Jung said that the Oracle upgrade was delayed so as to not "impair the momentum that we have today by shifting to a platform that we felt wasn't yet fully ready to support our business." She also said that it had been a "major feat to get [the Buckeye DC] up and running," and that the inventory was "generally high quality" and "in a really good healthy position." She explained that the inflated inventory numbers were "due to the congestion within the supply chain," and that "there is a large portion of the [inventory] in-transit." Then, three months later, on the November 3, 2022, earnings call, CFO Jung similarly said that "[w]e believe that our inventory is generally high quality" and "generally is very healthy right now."

Plaintiffs argue these statements gave investors the false impression that Buckeye DC was "up and running" when it was not; that the pandemic caused the high inventory levels rather than disfunction at Buckeye DC; that the excess inventory was not "dead;" and that the Oracle delay was not hampering operations. We disagree and find that none of these alleged statements breach the Exchange Act.

To start, none of the statements are demonstrably false or "capable of objective verification." *Weston Fam.*, 29 F.4th at 619. Plaintiffs' allegations detail that Buckeye DC was in fact "up and running" in August 2022, if inefficiently. It was staffed, product moved in and out, and the build-out was underway. Moreover, the transition stage was broadly "final," and the Company was in the process of moving its inventory to Buckeye DC from Washington. It was not false to blame increased inventory levels on delayed receipt of inventory; the complaint admits that "[t]he problems at the

Buckeye DC multiplied further when, in June 2022, transocean shipping containers containing inventory that had been stuck in port . . . began to arrive." And Plaintiffs detail just how inadequate the progress on the Oracle project was—it was not false for CFO Jung to indicate that Funko chose to delay the upgrade, which they felt would disrupt momentum. Insofar as Plaintiffs dispute there was "momentum," the complaint describes that there was, at least in August 2022, initiative in moving Buckeye DC's operations forward. This can be fairly characterized as "momentum."

Moreover, to the extent that Defendants embellished the quality of inventory, these statements were "puffery." "Puffery" is not actionable because "[w]hen valuing corporations, . . . investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers. . . . [P]rofessional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives." *Quality Sys.*, 865 F.3d at 1143 (quoting *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010)). Statements are only impermissible if they "provide 'concrete description of the past and present' that affirmatively create a plausibly misleading impression of a 'state of affairs that differed in a material way from the one that actually existed.'" *Alphabet*, 1 F.4th at 700 (quoting *Quality Sys.*, 865 F.3d at 1144).

Plaintiffs attempt to compare this case to others where the language crossed the line from puffery to falsehoods. In *Glazer*, for example, executives answered questions about sales numbers during earnings calls, explaining that their number of experienced sales representatives was "tracking very well" and that the company had a "very large [sales] pipeline." 63 F.4th at 759, 762. But at the time those

statements were made, the company was laying off sales representatives and losing sales, mischaracterizing lost sales as simply delayed. *Id.* at 756–57. We found that the allegations showed that those statements "contravened the unflattering facts in [the company's] possession," and provided "a concrete description of the past and present state of the pipeline." *Id.* at 770 (citation modified).

Plaintiffs remove the context from the *Glazer* defendants' comments. These were not merely offhanded and optimistic comments about sales numbers. *See id.* at 759. In response to questions about whether contracts would close and the company would see revenue from those sales, an executive gave detailed answers, explaining away lackluster sales numbers on "deal timing," stating that contracts "need a little bit more time in the oven," and pointing out that the company still had "technology win[s]" even though sales had not closed. *See id.* These answers included language like "tracking very well" and "very large pipeline," but, understood in context, that language summarized the specific answers the executive had given. *Id.* The exaggerations taken as whole, exceeded mere puffery, because, rather than merely expressing optimism, they provided "concrete" and false details that were part and parcel of the defendants' alleged fraud. *Id.* at 771.

Here, CFO Jung's comments in August 2022 that Funko's inventory was "generally high quality" or "in a really good healthy position" were less concrete. She explained that "inventory levels [were] up year-over-year," but that the Company "believe[d] that inventory is generally high quality and leave[s] [it] well positioned to meet [its] consumer demand and support [its] strong second half growth forecast." An analyst asked her to "dimensionalize inventory," and she explained that delays were related to the

supply chain, and that a "large portion" was "in-transit, but we're working to get that into the DC and get that out to our customers." It was in that context that she said, "we feel the inventory is in a really good healthy position, and we're poised to deliver on our back half results." CFO Jung's November 3, 2022, comments were similar, when she explained that "[i]nventory levels remain[ed] higher than the prior year" but that the Company "believe[d] that [its] inventory is generally high quality." When an investor asked "do you think you're going to have to take any actions on any of your owned inventory," she answered, "we are constantly looking at the quality of our inventory, and we think it generally is very healthy right now."

Such statements are "vague and generalized corporate commitments, aspirations, or puffery that cannot support" Exchange Act liability. *Alphabet*, 1 F.4th at 708. *Alphabet* serves as an illustration. 1 F.4th 687. In that case, Google and Alphabet executives had chosen to conceal from the public the discovery of a bug in their product which exposed users' data over a three-year period. *Id.* at 705–06. At the time, executives made public statements indicating that Google had a "very robust and strong privacy program," "a longstanding commitment to ensuring . . . that our users share their data only with developers they can trust," and that Alphabet was taking "great pains to make sure that people have great control and notice over their data." *Id.* at 708.

We held that these statements were mere puffery and not actionable. *Id.* In context, these specific statements, like CFO Jung's comments on the inventory's health and quality, did not "rise to the level of 'concrete description of the past and present' that affirmatively create a misleading impression of a 'state of affairs that differed in a material way from the one that actually existed.'" *Id.* (quoting *Quality*

*Sys.*, 865 F.3d at 1144). So there, and here, such statements are inactionable.

The gravamen of Plaintiffs' arguments as to these statements is that Defendants had an obligation to disclose more information about the state of Buckeye DC. But the Exchange Act imposes no "affirmative duty" to disclose information, *Alphabet*, 1 F.4th at 699 (quotation marks omitted), and even if Defendants could have disclosed additional information about operations at Buckeye DC, "a statement is not actionable just because it is incomplete." *Weston Fam.*, 29 F.4th at 619. As the Supreme Court explained, "the failure to disclose information . . . can support a Rule 10b-5(b) claim only if the omission renders affirmative statements made misleading." *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 265 (2024). The information CFO Jung's statements conveyed was either accurate or puffery. We cannot deem them misleading simply because Funko executives did not reveal more detailed information about Buckeye DC.

**ii.**

Next, to demonstrate falsity another way, Plaintiffs point to the risk disclosures in Funko's March 3, 2022, May 5, 2022, August 4, 2022, and November 3, 2022, SEC filings that concerned inventory management.[3] Plaintiffs argue that

[3] These risk disclosures are recounted in full above; in relevant part, the disclosures informed investors that Funko "must maintain sufficient inventory levels to operate [its] business successfully, but must also avoid accumulating excess inventory, which increases working capital needs and lowers gross margin." Further, the disclosures explained that "if demand or future sales do not reach forecasted levels, we could have excess inventory that we may need to hold for a long period of time,

the "risk disclosures" concealed the facts that Funko had already failed to manage its inventory and that its business, financial condition, and operations were already adversely affected.

Defendants argue, and the district court found, that Funko's risk disclosures were "forward-looking statements" and therefore protected by the PSLRA's safe harbor provision. Forward-looking statements are "statement[s] of the plans and objectives of management for future operations" and, with limited exceptions, are protected even where the elements of a Section 10(b) claim are adequately pleaded. *Glazer*, 63 F.4th at 767 (alteration in original) (quoting 15 U.S.C. § 78u-5(i)(1)(B)). In short, the Exchange Act does not hold a business executive liable for failing to predict the future. *Id.*; *Quality Sys.*, 865 F.3d at 1142. But as Plaintiffs argue, the relevant aspect of the risk disclosures here is not their future prognoses, but rather their tendency to mislead investors into thinking that, at the time a statement is made, the risks identified had not yet occurred.

We have endorsed such a theory before. Risk disclosures in an SEC filing can give rise to liability under the Exchange Act where they "warn[] that risks 'could' occur when, in fact, those risks had already materialized." *Facebook*, 87 F.4th at 948–49 (citing *Alphabet*, 1 F.4th at 702–05). In *Alphabet*, for example, after Google discovered its "privacy

write down, sell at prices lower than expected or discard." And the disclosures noted that "[i]f we are not successful in managing our inventory, our business, financial condition and results of operations could be adversely affected." The disclosures identified the "fourth quarter of 2019," during which Funko "wrote-down $16.8 million of inventory . . . to dispose of slower moving inventory to increase operational capacity which contributed to the Company's net loss for the period."

bug," it disclosed in SEC filings that "public concern about its privacy and security 'could' cause harm." *Id.* at 949 (quoting *Alphabet*, 1 F.4th at 696). We held that, "[a]lthough news of the privacy bug had not become public at the time of the [filings], . . . the risks of harm to Alphabet 'ripened into actual harm' when Alphabet employees discovered the privacy bug and the 'new risk that this discovery would become public.'" *Id.* (quoting *Alphabet*, 1 F.4th at 703). Therefore, the plaintiffs "plausibly alleged that Alphabet's warning . . . of risks that 'could' or 'may' occur was misleading to a reasonable investor when Alphabet knew that those risks had materialized." *Id.* (citation modified).

*Facebook* was a similar case. 87 F.4th at 944–46. There, Facebook and its executives became aware that a third party, Cambridge Analytica, accessed its users' data. *Id.* at 942. Rather than tell the public or its shareholders, Facebook disclosed in an SEC filing that the "failure to prevent or mitigate security breaches and improper access to or disclosure of our data or user data could result in the loss or misuse of such data" and that if "third parties or developers fail to adopt or adhere to adequate data security practices . . . our data or our users' data *may be* improperly accessed, used, or disclosed." *Id.* at 948. We held that the defendants had presented the risk of third parties improperly accessing and using Facebook users' data as purely hypothetical, which misrepresented the current state of affairs. *Id.* at 944–46.

Under the PSLRA's safe harbor for forward-looking statements, a defendant cannot be liable for a forward-looking statement unless the statement was made with *actual* knowledge of its falsity—as opposed to the heightened form of recklessness required for scienter in other types of securities fraud claims. *See infra* Part III.B. But where a

statement about the future is in the form of a warning about a risk that might hurt business in the future, the statement implicitly serves as a comment on the *present* state of affairs, because it suggests that the circumstance posing the risk has not yet occurred. It may therefore "create an impression . . . that differs in a material way from the [state of affairs] that actually exists." *Facebook*, 87 F.4th at 948. Such a statement does not fall under the safe harbor for forward-looking statements because its falsity lies not in the failure to predict the future, but in the implicit assertion about the present that the risk identified has not happened yet.

*Facebook* and *Alphabet* stand for the proposition that a disclosure of future risk can function as an observation about the present, so the plaintiffs in both cases therefore successfully stated a claim under an "affirmative misrepresentation theory." *Wochos*, 985 F.3d at 1188.

Contrary to Defendants' arguments here, we did not hold, and have never held, that a plaintiff pursuing a theory that implicit statements within risk disclosures that paint a false picture of present circumstances is required to demonstrate that a defendant had actual knowledge of the falsity (in the way a theory based on statements about the future would need to in order to fall outside of the safe harbor provision). *Id.* In *Facebook*, we observed that "[t]he mere fact that Facebook did not know whether its reputation was already harmed when filing the 10-K does not avoid the reality that it created an impression of a state of affairs that differed in a material way from the one that actually existed." 87 F.4th at 950 (citation modified). "[I]t is the fact of the breach itself, rather than the anticipation of reputational or financial harm, that caused anticipatory statements to be materially misleading." *Id.* *Alphabet* too stands for this basic proposition by citing cases where a

company's SEC filings misled investors when it identified risks as merely potential risks when in fact the events that presented as risks had actually occurred. 1 F.4th at 703–04.

Further, in *Berson v. Applied Signal Technology, Inc.*, 527 F.3d 982 (9th Cir. 2008), where we laid the groundwork for these types of claims based on the failure to alert investors that warned-of risks had already occurred, our discussion of why the challenged statements were misleading contained no mention of the defendants' knowledge. Rather, all our analysis of why the company's executives must have known that the risks had come to fruition was in our discussion of the scienter element, not the falsity element. *Id.* at 986–89.[4]

[4] *Weston Family Partnership LLLP v. Twitter, Inc.*, 29 F.4th 611 (9th Cir. 2022), which was decided between *Facebook* and *Alphabet*, addressed a statement about the future that would have needed to be made with actual knowledge of falsity to fall outside the PSLRA's safe harbor provision. *See id.* at 623 (explaining that the "July 2019 statements in [Defendant's] shareholder letter and 10-Q . . . were identified as forward-looking statements"). In that context, we observed that the plaintiffs did not actually adequately allege the knowledge in July 2019 upon which their falsity theory was premised—in other words, the actual knowledge of falsity that would have been required for the statements to fall outside the safe harbor. *Id.* at 622. *Weston Family* did not hold that actual knowledge is always a requirement for proving falsity. Nor could it have. *See* 15 U.S.C. § 78u-4(b)(1) (requiring only that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed"). Such a holding would have conflicted with the prior holding in *Facebook*, which a three-judge panel may not do. *Miller v. Gammie*, 335 F.3d 889, 899–900 (9th Cir. 2003) (en banc).

Therefore, we see no requirement that Plaintiffs allege actual knowledge of the risk disclosure's falsity to get their claims past dismissal on the falsity element. This makes sense. We consider *what* defendants knew and *when* they knew it under the scienter element of a securities action, not the falsity element. *Glazer*, 63 F.4th at 765.

In the present case, the relevant question is whether the allegations in the complaint allow for the reasonable inference that risk disclosures "create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Facebook*, 87 F.4th at 948 (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)). We also determine whether the relevant allegations are sufficiently particular for the purposes of Rule 9, and specific enough for the PSLRA. *See id.* We answer yes to all three questions.

By telling investors in March, May, August, and November 2022 that the Company "must also avoid accumulating excess inventory," that there is a risk of "hav[ing] excess inventory that [it] may need to hold for a long period of time," and that "[i]f [it is] not successful in managing [its] inventory, [its] business, financial condition and results of operations could be adversely affected," Funko implied that it was not presently experiencing those issues. Further, by invoking the 2019 incident which involved a $16.8 million write-down "to dispose of slower moving inventory to increase operational capacity," Funko gave investors the impression that the current state of affairs was not similar to those in 2019.

Yet, Plaintiffs allege, between April and May 2022, incoming trucks often had the wrong inventory, the influx of stock overwhelmed Funko's capacity to sort and store it, and

employees were conducting up to 50 investigations per day to track down misplaced inventory. Before the end of May, Buckeye DC's storage racks were at capacity and inventory was disorganized on the floor. Dead inventory was piling up and being moved from the Washington warehouses to Buckeye DC. By July, once-delayed shipping containers arrived and sat in the parking lot. Between 300 and 500 shipping containers' worth of inventory was neither scanned nor recorded, and as a result, could not be sent out to customers. By August, the warehouse team was 50 days behind fulfillment. By September, Buckeye DC began to ship partial orders and customers started to cancel orders. By October, Funko had rented a second warehouse in Arizona to store excess inventory, soon to be followed by yet another warehouse rental.

Taking Plaintiffs' allegations as true, throughout the class period, the repeated risk disclosures could have allayed concerns over inventory management while serious inventory problems bloomed, culminating in a massive write-off reminiscent of the 2019 incident. A reasonable investor could have been misled to believe that the current state of affairs was different from the one that actually existed with the exploding inventory. *See id.* at 944–46, 948–49. Because Plaintiffs plausibly allege that the inventory-related risk disclosures were sufficiently "false" for the purposes of Exchange Act liability, dismissal for failure to satisfy the falsity element is not warranted.

**iii.**

Our analysis of the risk disclosures concerning technology, another means through which Plaintiffs allege falsity, is similar to that in the previous section. Plaintiffs seek to hold Defendants liable for disclosing the risks of

"[f]ail[ing] to successfully operate [Funko's] information systems" and "implement[ing] new technology effectively." Although related, we see these risks as distinct, particularly when placed in the context of the times at which they were made, so we analyze them separately.

We start with the "new technology" disclosure. The transition from Microsoft NAV to Oracle remained in progress at the start of 2022. Defendants did not make the "technology risk disclosure" until May 5, 2022, when they told investors that "[f]ailure to . . . implement new technology effectively could disrupt our business or reduce our sales or profitability" and that "[w]e are also in process of upgrading our enterprise resource planning software globally, beginning in the United States. If the potential upgrades are not successful or result in delays, our business could be disrupted or harmed." On August 4, 2022, Defendants told investors largely the same thing but added that "[t]he efficient operation and successful growth of our business depends on these information systems, including our ability to . . . upgrade them effectively." They added that "[i]n August 2022, we announced that we are delaying the remaining steps for implementation of our enterprise resource planning software to 2023. If the potential upgrades are not successful or result in further delays, our business could be disrupted or harmed."

These disclosures did not give investors the impression that the Oracle upgrade was completed or going well, nor warranty of Funko's operational capacity. Furthermore, CFO Jung told investors on May 5, 2022, that "the [Oracle] ERP is set to come out at the end of the quarter." Thus, when the company issued its risk disclosure statement on May 5, 2022, no delay in the Oracle upgrade had yet materialized. Similarly, in August, Funko specifically said that it was

"delaying the remaining steps for implementation of [Oracle] to 2023." Any risk that the Oracle upgrade may "result in further delays," as Funko warned in that Form 10-Q, had not yet materialized.

The same cannot be said about the company's risk disclosure statements concerning its then-existing technology and its use of that technology. Funko told investors in May that the "[f]ailure to successfully operate [its] information systems . . . could disrupt [its] business or reduce [its] sales or profitability," and that it "rel[ied] extensively on various information technology systems and software applications, including [its] enterprise resource planning software, to manage many aspects of [its] business, including product development, management of [its] supply chain, sale and delivery of [its] products, financial reporting and various other processes and transactions." Funko stated that it was "critically dependent on the integrity, security and consistent operations of these systems and related back-up systems" and warned that "[t]he failure of these information systems to perform as designed, [or its] failure to operate them effectively . . . could disrupt [its] business, require significant capital investments to remediate a problem or subject [it] to liability." In August, Funko added that "[t]he efficient operation and successful growth of [its] business depends on these information systems, including [its] ability to operate . . . them effectively."

A rational trier of fact could find that a reasonable investor could have drawn the inference that, at the time Funko made these disclosures, the Company was handily operating its information technology systems; or at least that its business was not disrupted.

But Plaintiffs allege that Microsoft NAV was insufficient to support Funko's needs and the Complaint is replete with specific examples of technology failure hampering Funko's business. By April, workers were unable to efficiently scan and track inventory arriving at Buckeye DC. Because the NAV system did not limit user permissions, when incoming workers at Buckeye DC updated the inventory system with the product that was received, this changed the inventory counts in the system. Workers were also forced to use Excel spreadsheets and handwritten notes to track inventory, rather than Funko's ERP system. These problems compounded the inventory management problems, causing delays and loss of product; the problems continued through August and the arrival of the delayed shipping containers.

This state of affairs is sufficiently distinct from the impression that Funko's risk disclosures plausibly gave a reasonable investor about its use of then-existent information technology to provide a reasonable inference of falsity. Accordingly, we hold that Plaintiffs have pleaded with sufficient particularity factual allegations giving rise to Exchange Act liability sufficient to surmount Rule 9 and the PSLRA.[5]

[5] A brief final note about the risk disclosures' falsity: as noted, we remain at the pleading stage. Although we hold that Plaintiffs' allegations are plausible and have been pleaded with sufficient particularity, there remain factual questions that eventually might not be resolved in Plaintiffs' favor. For example, whether the actual state of affairs at the time of the risk disclosures differed from those impressions in a material way is a question of fact.

**iv.**

The final statement that Plaintiffs argue was false is CFO Jung's comment at Funko's September 13, 2022, Investor Day meeting. An analyst asked CFO Jung about increasing costs, which she explained had resulted from investments "in the ERP as well as in the distribution center." Another asked her to "quantify how much investment is needed for . . . internal growth," and CFO Jung responded, "[o]bviously, down the road, we'll eventually need probably more distribution capabilities to continue [to] support the growth, but that's more of a future down the road within the 5-year plan, but not directly related within the next, call it, 12 months or so." Plaintiffs allege that, at the time, Buckeye DC was far beyond its capacity, as evidenced by the need to rent a third-party warehouse two weeks after the statement was made.

CFO Jung's September 13, 2022, statement is squarely within the PSLRA's safe harbor provision as it is a "forward-looking statement," meaning a "statement[] of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer." *Glazer*, 63 F.4th at 767 (quoting 15 U.S.C. § 78u-5(i)(1)(B)). CFO Jung plainly said that Funko would need distribution capability "down the road." Unless Plaintiffs can "prove that the statement 'was made with actual knowledge . . . that the statement was false or misleading,'" *id.* (omission in original) (quoting 15 U.S.C. § 78u-5(c)(1)), the safe harbor provision protects her from liability for failing to see that the road was much shorter than anticipated. Plaintiffs' complaint lacks the requisite specificity to grant the inference that CFO Jung knew that this prediction would prove false.

Plaintiffs characterize CFO Jung's comment as a "mixed statement," meaning one that "combine[s] non-actionable forward-looking statements with separable—and actionable—non-forward-looking statements." *Wochos*, 985 F.3d at 1190. "[I]n order to establish that a challenged statement contains non-forward-looking features," a statement must go "*beyond* the articulation of 'plans,' 'objectives,' and 'assumptions' and instead contain[] an express or implied 'concrete' assertion concerning a specific 'current or past fact.'" *Id.* at 1191 (quoting *Quality Sys.*, 865 F.3d at 1142, 1144). "[I]t is not enough to plead that a challenged statement rests on subsidiary premises about how various *future* events will play out over the timeframe defined by the forward-looking statement," as "such 'statement[s] of the assumptions underlying or relating' to a declared objective are also deemed to be forward-looking statements." *Id.* at 1192 (quoting 15 U.S.C. § 78u-5(i)(1)(D)). Plaintiffs fail to meet this bar. CFO Jung spoke only of a future need for distribution centers, and any insinuation Plaintiffs say she made was insufficient to turn her forward-looking statement into a mixed statement.

**B.**

We now turn to scienter. "'Scienter' as used in the federal securities laws means the 'intent to mislead investors' or deliberate recklessness to 'an obvious danger of misleading investors.'" *Glazer*, 63 F.4th at 765 (quoting *NVIDIA*, 768 F.3d at 1053, 1059). "Deliberate recklessness is a higher standard than mere recklessness and requires more than a motive to commit fraud." *Id.* (citing *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016)). That is, deliberate recklessness is "an *extreme* departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is

either known to the defendant or is so *obvious* that the actor must have been aware of it." *Schueneman*, 840 F.3d at 705 (omission in original) (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009), *as amended* (Feb. 10, 2009)). Recklessness therefore only satisfies the scienter requirement insofar as it reflects "some degree of intentional or conscious misconduct." *Glazer*, 63 F.4th at 765 (quoting *Nursing Home*, 380 F.3d at 1230).

Under the PSLRA's heightened pleading standard, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). In examining the operative complaint, we must "assess all the allegations holistically to determine whether the inference of scienter is cogent and compelling." *Alphabet*, 1 F.4th at 701 (quotation marks omitted). "'[M]erely reasonable or permissible' inferences are insufficient." *Id.* (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007)). "As a result, courts must take into account plausible opposing inferences and determine that a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* (quoting *Tellabs*, 551 U.S. at 323, 324).

Assessing whether a plaintiff meets the PSLRA's strong inference requirement is a "dual inquiry": first, this court determines whether any of the allegations, alone, are sufficient to give rise to a strong inference of scienter; second, if no individual allegations are sufficient, this court conducts a "holistic" review to see if the allegations, when considered together, give rise to a strong inference of

scienter. *Glazer*, 63 F.4th at 766 (citing *Zucco*, 552 F.3d at 992).

Finally, as a corporation, Funko can "'only act through its employees and agents' and can likewise only have scienter through them." *In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 475 (9th Cir. 2015) (quoting *Suez Equity Invs., L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001)). Accordingly, the "scienter of the senior controlling officers of a corporation may be attributed to the corporation itself to establish liability as a primary violator of § 10(b) and Rule 10b-5" so long as "those senior officials were acting within the scope of their apparent authority." *Alphabet*, 1 F.4th at 705 (quoting *ChinaCast*, 809 F.3d at 476).[6]

Plaintiffs argue that they satisfy the PSLRA's pleading requirements under the core operations doctrine. The core operations doctrine is "a scienter theory that infers that facts critical to a business's 'core operations' or an important transaction are known to a company's key officers." *NVIDIA*, 768 F.3d at 1063 (quoting *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 783 (9th Cir. 2008)). Core

[6] In their briefs, Plaintiffs argue that CEO Perlmutter's, CFO Jung's, and COO Sansone's scienter can be attributed to Funko. Defendants do not dispute that CEO Perlmutter and CFO Jung's scienter could establish liability for Funko but contend that Plaintiffs have forfeited their argument as to COO Sansone by failing to raise it below. We generally do not consider an issue raised for the first time on appeal subject to limited exceptions. *Cold Mountain v. Garber*, 375 F.3d 884, 891 (9th Cir. 2004), *as amended* (Aug. 9, 2004). Plaintiffs did not raise their argument as to COO Sansone's scienter before the district court and we decline to exercise our discretion to consider it now. We therefore consider only whether Plaintiffs sufficiently allege scienter as to CEO Perlmutter and CFO Jung, which would then be imputed to Funko.

operations allegations support a strong inference of scienter in three circumstances: "(1) when they, along with other allegations, support a cogent and compelling inference of scienter" as part of a court's holistic review of a plaintiff's allegation; "(2) when [the allegations] are themselves particular and suggest that the defendants had actual access to the disputed information; and (3) in the 'rare circumstances' when [the allegations] are not particularized, but 'the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter.'" *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1111 (9th Cir. 2021) (quoting *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014)).

Plaintiffs argue that they adequately allege that inventory management and Funko's use of information technology were so critical to its business operations that a reasonable trier of fact could find that CEO Perlmutter and CFO Jung must have known about the chaos that was ensuing at Buckeye DC as the warehouse rapidly accumulated excess inventory and failed to onboard the new information technology system. In other words, they argue that this is one of the "rare circumstances" where the third prong of the core operations applies. Defendants respond, as the district court held, that Plaintiffs' do not plausibly allege that it would be "absurd" to suggest that CEO Perlmutter and CFO Jung did not know about the issues with inventory management or the Oracle ERP. We agree with Plaintiffs.

In *Berson*, the plaintiffs sued a corporation, Applied Signal Technology, Inc., which they alleged had failed to properly disclose "stop-work orders" that eventually resulted in a "precipitous drop" in its revenue. 527 F.3d at 984. Plaintiffs alleged "no particular facts indicating" that

Applied Signal's CEO and CFO "actually knew about the stop-work orders." *Id.* at 987. Rather, they argued that due to the nature of their roles, these "high-level managers must have known about the orders because of their devastating effect on the corporation's revenue." *Id.* We agreed, reasoning that, because both the CEO and CFO were "directly responsible for Applied Signal's day-to-day operations," it was "hard to believe that they would not have known about stop-work orders that allegedly halted tens of millions of dollars of the company's work." *Id.* at 988 & n.5. This was particularly so given that one of the stop-work orders in question related to the company's largest contract with one of its most important customers. *Id.*; *see also S. Ferry*, 542 F.3d at 785 n.3. Accordingly, we held that because the stop-work orders were "prominent enough that it would be 'absurd to suggest' that top management was unaware of them," the plaintiffs' allegations established a strong inference that the Applied Signal's CEO and CFO acted with scienter in making misleading statements. *Berson*, 527 F.3d at 989 (quoting *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 943 n.21 (9th Cir. 2003)).

Our holding in *Berson* built on our decision in *America West*, 320 F.3d 920, where we approved "a similar inference" in the absence of allegations of "particular facts" of scienter. *Berson*, 527 F.3d at 987–88. In *America West*, plaintiffs sued a commercial air carrier (America West), its individual officers, and majority shareholders, alleging that the defendants failed to inform investors about America West's ongoing maintenance problems and investigations by the Federal Aviation Authority ("FAA"). 320 F.3d at 932–33. To connect one of the carrier's shareholders to the alleged misrepresentations, the plaintiffs alleged that two of

that shareholder's officers were members of America West's Board of Directors and therefore would have been aware of these issues. *Id.* We agreed, reasoning that, given the importance of the company's maintenance problems and the FAA's investigations into them, it was "absurd to suggest that the Board of Directors would not discuss" them. *Id*. at 943 & n.21.

Here, Plaintiffs allege that Funko's inventory management and its use of information technology were as important to Funko as the stop-work orders in *Berson* and the maintenance issues and FAA investigations in *America West*. Beginning with management of inventory, Plaintiffs allege that effective inventory management was essential to Funko's ability to operate and continue to grow as a business. Funko's licensing agreements gave it only a limited period to sell products created using certain IP. For its "current release" products—created to capitalize on short-lived market demand emerging around pop-culture trends and new entertainment releases—this time imperative was further heightened. These products had a "limited duration of market demand" meaning that Funko needed to be able to rapidly turn these products around if it was to cover the costs of licensing and production and ultimately make a profit.

If Funko could not turn its products around quickly, it would be left with dead product in its warehouse that it could not sell. This scenario could cost Funko far more than just the loss accrued from the costs of manufacturing and transporting these unsellable products; dead inventory could clog up limited warehouse space and prevent Funko from properly storing new product, incur additional cost for storage, and lead to a vicious cycle of further losses. Given Funko's business model, its ability to effectively manage

inventory was critical to its business operations. Funko admitted as much. Taking Plaintiffs' allegations as true, a rational fact finder could find that it would be absurd for Funko's CEO or CFO not to have closely monitored the company's management of its inventory, especially in its highly touted Buckeye DC.

Plaintiffs also allege that Funko's effective use of information technology was key to its ability to manage its inventory effectively, as Funko itself acknowledged in risk disclosure statements. Plaintiffs make many allegations that Funko viewed its information technology system as integral to its success as a business. Funko's transition to the Oracle ERP was driven by its goal of modernizing and improving its handling of inventory and management of its distribution centers. And the transition to Buckeye DC—Funko's largest ever distribution center, which would house approximately 80% of its products within the United States—was partly with the aim of moving to a consolidated distribution center built around the new information technology system. Plaintiffs allege that both the Buckeye DC and Oracle projects were viewed as central priorities by Funko's executive leadership. Plaintiffs allege that Funko's executive leadership attended bi-weekly "Steering Committee" leadership meetings directly related to the transition to the new information technology system. And beginning in June 2022, COO Sansone began spending between one to two weeks per month at the Buckeye DC to oversee the project and information upgrade personally—

demonstrating the importance with which Funko viewed these projects.[7]

The potential damage that could result from Funko failing to manage its inventory effectively was also not hypothetical. Plaintiffs allege that, in 2019, Funko accumulated 10 to 12 million obsolete units of product in its warehouses, which prevented it from effectively warehousing and distributing new product: eventually leading to a $16.8 million write-down and 40% drop in its share price. CEO Perlmutter and CFO Jung were senior executives at Funko at the time and therefore were aware of the impact that could result from failures to manage inventory. Indeed, Plaintiffs allege that the risk factor disclosures at issue specifically reference this incident in 2019.

The district court found that Plaintiffs' allegation that this 2019 write-down led to a similar securities fraud suit against Funko was not relevant to its scienter analysis because the court was "not persuaded that separate litigation

[7] Although these allegations relate to the importance with which Funko viewed the Buckeye DC and Oracle project specifically, Plaintiffs' complaint demonstrates that these projects cannot be separated from Funko's use of its existing information technology system. And these projects, in turn, were inextricably bound up with its effective management of inventory. Simply, the entire reason for transitioning to Oracle was because its existing information technology system was no longer fit for its purposes. The Oracle system was central to Funko's plans for the Buckeye DC, which was to be built around the upgraded ERP. Finally, both projects directly related to efforts to ensure Funko could continue to manage inventory effectively. Thus, Plaintiffs' allegations related to the Oracle project and Buckeye DC bear on CEO Perlmutter and CFO Jung's knowledge of difficulties related to its then-existing information technology system to the extent that they show the prominence afforded information technology internally within Funko.

involving a different time period and different, now-settled claims should have put the defendants on notice that the statements at issue here were misleading." To be sure, prior litigation of similar alleged fraudulent conduct does not mean that CEO Perlmutter and CFO Jung would necessarily know that their later statements were misleading. But in light of the alleged 2019 incident, we infer that a reasonable trier of fact could find that Funko's senior management would have been aware of the deleterious impact that inventory mismanagement could have and would therefore be particularly attuned to inventory-related issues. Likewise, a reasonable trier of fact could also find it absurd to suggest that Defendants would not have been aware of Funko's difficulties in managing its inventory given the scale of the chaos at Buckeye DC and that Funko had experienced similar inventory-related issues a mere three years prior, causing losses in the millions.

Given this background, we find Plaintiffs' allegations provide a "narrative that strongly points to the existence of scienter." *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1035 (9th Cir. 2016). The district court reasoned that the inventory-related issues at Buckeye DC were the sort of "granular details" that would not have been readily apparent to CEO Perlmutter or CFO Jung. But even disregarding Plaintiffs' core business doctrine allegations that establish a strong inference that CEO Perlmutter and CFO Jung would have known of the issues at Buckeye DC, by June 2022, COO Sansone was spending between one to two weeks each month at the warehouse—where he "walk[ed] the floor" and spoke with warehouse employees to resolve emerging issues. COO Sansone would have seen first-hand the issues that were emerging because of the failure of Funko's

information technology system and the implications this had for its management of inventory.

Further, throughout this period, both CEO Perlmutter and CFO Jung attended regular meetings about the transition to the new information technology system. Plaintiffs allege that at these meetings, CEO Perlmutter and COO Jung discussed aspects of the Oracle project with COO Sansone, including whether to delay implementation or open Buckeye DC without Oracle. Given how critical Funko's management of inventory, use of information technology, and Buckeye DC upgrade were for its operations, we find it strongly likely that COO Sansone would have shared information about the issues he had seen first-hand with CEO Perlmutter and CFO Jung at these bi-weekly technology transition meetings.[8]

Defendants argue that Plaintiffs' claims fail because they do not affirmatively establish knowledge on the part of CEO Perlmutter and CFO Jung of the inventory and information technology issues. But, as we discussed, Plaintiffs do not need to establish affirmative knowledge so long as they raise a strong inference that Defendants would have known of the issues given their importance to Funko's business, as we hold they do here.

Further, Defendants dispute the applicability of *Berson* and argue that the four stop-work orders in *Berson* are distinguishable as "discrete, identifiable events with an

[8] Although, as noted, we decline to consider Plaintiffs' arguments that COO Sansone's scienter can be attributed to Funko, we conclude that allegations as to COO Sansone's knowledge of the scale of the problems at Buckeye DC are relevant to the extent that we can draw the strong inference that he would have informed CEO Perlmutter and CFO Jung of those problems.

immediate and catastrophic impact" as opposed to Funko's inventory and information technology issues that led to only small write downs relative to the overall revenue of Funko. This argument misses the point.

In *Berson*, it was absurd to believe that the CEO and CFO would not have been aware of the stop-work orders because they were directly responsible for "[the company's] day-to-day operations" and there was therefore a strong inference that they would know about the stop-work orders given the prominence of the contracts involved. 527 F.3d at 988. The size of the potential economic loss implicated by the stop-work orders was relevant to the core operations analysis only insofar as it went to the likelihood that the company's executive leadership were aware of the stop-work orders.

Here, Plaintiffs allege that effective management of inventory and use of information technology were afforded similar prominence internally at Funko. And, as noted, they also allege that the impact of inventory-related issues was well-known to both CEO Perlmutter and CFO Jung: previous issues had led to a 40% drop in Funko's share price. Finally, Plaintiffs allege that the issues here ultimately led to a 59% drop, which is far from insignificant. Regardless of the size of the write-down relative to Funko's overall revenue, Plaintiffs allege that inventory management and effective use of its information technology system were a core part of Funko's business operations at the time the alleged false statements were made.

In sum, we conclude that a reasonable trier of fact could find that it would be absurd to believe that CEO Perlmutter and CFO Jung did not know that their statements related to

Funko's inventory and information technology system were misleading at the time that they were made.

**C.**

We now turn to Plaintiffs' control liability claim under Section 20(a). Section 20(a) "imposes liability on a person who is in control of the person who is directly responsible for a securities fraud violation," where there is a violation of the statute. *Alphabet*, 1 F.4th at 701–02. The district court found that because Plaintiffs failed to state a claim under Section 10(b), their Section 20(a) claim also failed. *Id.* at 701–02 ("'[I]f a plaintiff fails to adequately plead a primary violation,' then Section 20(a) claims 'may be dismissed summarily.'" (quoting *Zucco*, 522 F.3d at 990)). Because we reverse the district court's determination as to Plaintiffs' Section 10(b) claim, we also reverse as to Plaintiffs' Section 20(a) control liability claim.

**IV.**

What began as a familiar story of excess inventory of unloved toys collecting dust in distant warehouses, ultimately presents a familiar question in securities law: whether shareholders were being told the truth when the risks Funko faced had ceased to be merely hypothetical. We affirm the district court with respect to the falsity of affirmative statements regarding the Buckeye DC operations and the quality of Funko's inventory, and Funko's distribution capabilities, as well as the risk factor statements in SEC filings regarding Funko's upgrade of technology. We reverse with respect to the falsity of the risk factor statements in SEC filings regarding Funko's inventory management and the company's use of its existing information technology systems, as well as with respect to

scienter regarding the falsity of those statements. We also reverse as to Plaintiffs' Section 20(a) control liability claim.

**AFFIRMED in part, REVERSED in part, REMANDED.**